**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

| | |
|---|---|
| JOHN DOE,<br><br>   Plaintiff,<br><br>v.<br><br>THE UNIVERSITY OF IOWA; KRISTA KRONSTEIN, in her individual and official capacity as Investigator in the Office of Student Accountability; KRISTAL GIBSON, in her individual and official capacity as Associate Director in the Office of Student Accountability; and TANYA UDEN-HOLMAN, in her individual and official capacity as Associate Provost for Undergraduate Education,<br><br>   Defendants. | **CASE NO. 3:22-cv-00001**<br><br><br><br>**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |

**TABLES OF CONTENTS**

I.    INTRODUCTION ...................................................................................................... 2

    A.  Procedural History ............................................................................................. 2

II.   BACKGROUND  FACTS ......................................................................................... 3

    A.  Applicable Policies and the University's Disciplinary Process for Student Sexual Misconduct. ......................................................................................... 3

    B.  The Complaint Against Doe. ............................................................................. 8

    C.  The Investigative Report. .................................................................................. 9

    D.  Prehearing Proceedings. ................................................................................... 9

    E.  The Hearing. .................................................................................................... 12

    F.  Sanctions Issued. ............................................................................................ 12

    G.  Doe's Appeal to the Provost. ......................................................................... 13

    H.  Doe's Appeal to the Board of Regents. .......................................................... 13

III.  LEGAL STANDARD .............................................................................................. 14

IV.  ARGUMENT ........................................................................................................... 15

A.   This Court Should Grant Summary Judgment to Defendants on Plaintiff's Title IX claim. .................................................................................................... 15

B.   This Court Should Grant Summary Judgment to the Defendants on Plaintiff's 42 U.S.C § 1983 Claim for Violation of His Equal Protection Rights. ............. 33

C.   This Court Should Grant Summary Judgment to the Defendants on Plaintiff's 42 U.S.C. § 1983 Claim for Violation of His Procedural Due Process Rights. . 39

V.   CONCLUSION ....................................................................................................... 49

## I.   INTRODUCTION

Plaintiff John Doe implores this Court to overturn the University of Iowa's decision to expel him from its student body in January of 2021. In support of his request, Doe offers only generalized, unsubstantiated claims that UI expelled him because he is a man. In reality, Doe was expelled from UI after an independent Adjudicator determined that he had violated UI's Sexual Misconduct Policy and Code of Student Life when he met a drunk and high young woman at a party, isolated her in his bedroom, and sexually assaulted her. Because Doe can present no evidence that UI's disciplinary decision was the result of sex discrimination, or that UI failed to provide him with adequate process, this Court should grant Defendants' Motion for Summary Judgment and dismiss this case in its entirety.

### A.   Procedural History

On September 13, 2022, Plaintiff filed his First Amended Complaint[1] ("Complaint") against Defendants the University of Iowa ("UI" or "the University"), Krista Kronstein, Kristal Gibson, and Tanya Uden-Holman. In his Complaint, Doe raised various legal claims stemming from his expulsion by the University for violations of the

---

[1] The Court granted Defendants' Motion to Dismiss under Federal Rule of Civil Procedure 8 without prejudice on September 2, 2022, and directed Plaintiff to amend his complaint to conform with that rule. (Doc. 11, Order Granting Motion to Dismiss Without Prejudice and Denying as Moot Motion to Strike).

University's Sexual Misconduct Policy and Code of Student Life. Plaintiff alleges numerous faults with the University's handling of his disciplinary proceedings and claims the manner of the proceedings was so noncompliant with UI's policies that it violated his constitutional and statutory rights.

Plaintiff's First Amended Complaint sets forth three claims: (1) a Title IX claim against the University (Count 1); (2) a 42 U.S.C. § 1983 Equal Protection claim against the Individual Defendants in their individual and official capacities (Count 2); and (3) a 42 U.S.C. § 1983 Violation of Due Process claim against the Individual Defendants in their individual and official capacities (Count 3). With the close of discovery in this matter, it is clear that Plaintiff's remaining claims fail as a matter of law. Even when the evidentiary record is viewed in the light most favorable to Plaintiff, there is no genuine issue of material fact on any of Plaintiff's claims, and Defendants are entitled to judgment as a matter of law.

## II.   BACKGROUND FACTS

Defendant UI is a public institution of higher education based in Iowa City, Iowa. (SOF ¶ 2). At the time of the events alleged in the Complaint, John Doe was an undergraduate student at the University of Iowa. (SOF ¶ 1).

### A.   Applicable Policies and the University's Disciplinary Process for Student Sexual Misconduct. [2]

The University maintains a Code of Student Life, which sets forth the "standards of student behavior and conduct . . ." and incorporates various other University policies.

---

[2] Doe's student misconduct case was subject to the laws, policies, and procedures which were in place at the time of the events outlined in his Complaint.  The events which are the subject of Doe's lawsuit occurred prior to August 14, 2020, when the U.S. Department of Education's new Title IX regulations went into effect. *See* 34 C.F.R. Part 106.

(App. 428-67). Among these include the University's Sexual Misconduct Policy ("SMP"), which "prohibits sexual misconduct . . . in any form, including sexual assault or sexual harassment, and any form of nonconsensual sexual conduct." (App. 468-80, at 469).

The SMP also provides definitions and examples of concepts such as sexual misconduct, sexual assault, and consent, as used in the SMP and Code. The SMP defines "sexual misconduct" as "a broad term encompassing any unwelcome behavior of a sexual nature that is committed without consent or by force, intimidation, coercion, or manipulation." (App. 470; SMP, § 2.3(a)). It also states that sexual misconduct "can be committed by a person of any gender, and it can occur between people of the same or different gender." (*Id.).* The SMP defines "sexual assault" to include "intentional contact with the breasts..." and "any other intentional unwanted bodily contact of a sexual nature."  (App. 470-71; SMP, § 2.3(c)). Finally, the SMP provides an explanation for "consent," including that consent can be expressed "either by words or clear, unambiguous actions;" that "[l]ack of protest or resistance does not mean consent, nor does silence mean consent;" that "consent must be present throughout the sexual activity" and a participant can "communicate a desire to no longer consent to continuing the activity;" and that consent "to one form of sexual activity does not imply consent to other forms of sexual activity." (*Id.;* SMP, § 2.3(c)).

The SMP empowers student-victims of sexual misconduct to make complaints of sexual misconduct by either of two methods: the student can make a UI policy complaint with the Office of the Sexual Misconduct Response Coordinator ("OSMRC"), and/or the student can make a criminal complaint to law enforcement, such as the UI Department of Public Safety. *See* (App. 477-79; SMP, § 2.9). Furthermore, a student can seek informal assistance from the OSMRC. *Id.* If the OSMRC is notified of a potential sexual misconduct

violation by someone other than the alleged victim, the OSMRC will reach out to the victim to determine if he or she wants UI to investigate. (*Id.*). Additionally, the SMP outlines resources available for accused students, such as due process procedures, mental health counseling, and an explicit prohibition of making false complaints of sexual misconduct. (App. 476-77; SMP, § 2.7).

UI policy complaints are governed by the University's Student Judicial Procedure (referred to herein as "SJP" but also known as "Student Misconduct Procedure"), which provides the "process for investigating and resolving alleged violations of University policies by students." (App. 448-67, at 448, § 1). "The student misconduct system is not a substitute for the civil or criminal court system." (*Id.*) Rather, it is the process by which UI determines whether its rules have been violated. (*Id.*).

The process is overseen and implemented by the Dean of Students. (*Id.*). The Dean of Students assigns an official to investigate the complaint. (App. 450-51; SJP, § 4). During the investigation, both the victim and the accused may: bring an advocate and advisor, such as legal counsel, to any meeting with the investigator; meet with the investigator; submit documents or other relevant evidence to the investigator; identify witnesses who may have relevant information, and receive periodic updates on the status of the investigation. (*Id.*). The investigator maintains full discretion as to which witnesses to contact, based upon the parties' description of what information each witness could provide. (*See id.*). During the investigation, the accused may be subject to interim sanctions, depending on the nature of the alleged violation. (App. 451; SJP, § 5).

Upon the completion of the investigation, the investigator writes a report detailing their fact findings, determines if the complaint is founded based on a preponderance of the evidence, and, if so, makes a recommendation to the Dean of Students as to the

appropriate final sanctions. (*See* App. 454-55; SJP, §§ 9-10). If the investigator recommends the accused face suspension or expulsion, the Dean of Students will schedule a formal administrative hearing, with an official assigned as a "charging officer" and another assigned as the "adjudicator." (App. 455-56; SJP, § 12(A)).

The charging officer is to "coordinate the presentation of witnesses and evidence against the accused student, and urge the adjudicator to find the accused student responsible for" the alleged violation(s). (App. 456; SJP, § 12(B)). The charging officer also issues a notice of hearing to both the complainant and accused, which must include: (1) the time, date, and location of the hearing; (2) the name(s) and contact information of the adjudicator and charging officer; (3) the facts and circumstances supporting the allegation; (4) the rule(s) allegedly violated; (5) a preliminary description of the witnesses and exhibits the charging officer intends to use at the hearing; (6) a copy of the SJP; (7) a description of any interim sanctions imposed before the hearing; and (8) information about the parties' right to bring an advocate, attorney, and/or advisor to the hearing. (App. 456-57; SJP, § 12(C)).

All parties, as well as their attorneys or advocates, have the right to attend the hearing in-person, though a partition may be erected upon request by one of the parties. (*See* App. 459-62; SJP, § 12(H)). Attorneys may call witnesses, ask clarifying procedural questions of the adjudicator, make objections to witnesses, evidence, or other issues, and consult with their client. (*Id.*). The adjudicator conducts all questioning of the witnesses, though the parties may pose questions for the adjudicator to ask in writing. (*Id.*). The adjudicator has full discretion as to the order and phrasing of the questions. (*Id.* at subsection 8).

6

The adjudicator also has discretion to receive and consider evidence and will "base a finding upon the kind of evidence which reasonably prudent persons are accustomed to rely for the conduct of their serious affairs." (*Id.* at subsection 9). Except where otherwise provided, "formal or technical rules of evidence or procedure utilized in courtrooms do not apply to the hearing." (*Id.*). Further, the adjudicator's decision may be based on evidence that is not admissible in a civil or criminal court. (*Id.*). "Irrelevant, immaterial, or unduly repetitions evidence should be excluded." (*Id.*). The adjudicator may also "accommodate concerns about safety, well-being, confrontation, or scheduling . . . in any manner determined in the sole judgment of the adjudicator to be appropriate." (*Id.*). To make such accommodations, the adjudicator may utilize partitions, permit testimony via telephone, or receive testimony via recording or written statement. (*Id.* at subsection 11).

Within ten (10) days of the hearing, the adjudicator issues their written decision, summarizing their findings of fact, identifying the relevant policies at issue, and determining whether the accused is responsible for violating said policies. (App. 463; SJP, § 13). In cases where the accused is found responsible, the Director of Student Accountability determines what sanctions to impose and issues a letter explaining the chosen sanctions. (*Id.*). The SJP includes a list of possible sanctions. (App. 463-65; SJP, § 14). Per the SJP, cases involving sexual assaults "will ordinarily result in the suspension or expulsion of the" accused student. (*Id.* at subsection I).

Either party may appeal the decision of the adjudicator and/or Dean of Students within ten (10) days of the conclusion of the investigation and sanctioning process. (*See* App. 465-46; SJP, § 15). The SJP outlines five specific grounds for appeal. (App. 466; SJP, § 16). If an appeal is received, the appeal officer must review the appeal and issue a decision letter within ten (10) days of receiving the notice of appeal.  (App. 467; SJP, §

17). This decision letter will represent the University's final action on the matter, but also includes reference to the appeal procedure provided by the Iowa Board of Regents ("Regents"). (*Id.*; *see also* Iowa Board of Regents, Board Policy Manual, § 1.7 Appeals to the Board, *available at* [1.7 Appeals to the Board | Board of Regents State of Iowa (iowaregents.edu)](https://iowaregents.edu) (last visited June 14, 2023)).

If the Regents receive an appeal by a party, they conduct a similar review, including of the underlying record and written briefs submitted by the appealing party, the University, and any other parties to the case. (*See* Board Policy Manual, § 1.7(3)). The full Board then votes on the appeal, either affirming or reversing the University's decision. (*Id.* at § 1.7(3)(H)). The Regents' decision represents the final administrative action on the matter. (*Id.*).

### B.    The Complaint Against Doe.

On December 23, 2019, Complainant, a then-Sophomore at the University of Iowa, made a report to UI's Sexual Misconduct Response and Title IX Coordinator, Monique DiCarlo. (App. 01-02). Complainant told Ms. DiCarlo over the phone that she had been sexually assaulted at a Halloween Party that took place on October 31, 2019. (SOF ¶ 13). Defendants Gibson and Kronstein were assigned to investigate the complaint, with Kronstein leading the investigation. (SOF ¶ 14). Gibson and Kronstein met with Complainant on January 14, 2020. There was some confusion at that time regarding Doe's identity. (App. 06 (Complainant interview notes from 1/14/2020); App. 67-114 (Investigator Report)). During the month of February 2020, Kronstein and Gibson interviewed several witnesses. (SOF ¶ 16).

On February 24, 2020, Kronstein issued a "Notice of Complaint and Investigation" to Plaintiff, which informed him that Complainant had filed a formal complaint of sexual assault against him and that the University intended to initiate a formal investigation into the allegations. (SOF ¶ 17). Throughout the remainder of February and March 2020, Kronstein and Gibson interviewed additional witnesses. (SOF ¶ 16).

### C.    The Investigative Report.

On September 14, 2020, Kronstein and Gibson formally concluded their investigation and issued their Investigative Report. (SOF ¶ 20). In their forty-eight-page report, the two determined that Plaintiff likely "violated the Code of Student Life Rules D.12 Violation of University Policy, Section 2.3(e) Sexual Assault and D.23 Assaultive Behavior due to Reporting Party's incapacitation." (SOF ¶ 20). The Investigators recommended that Plaintiff be suspended and that the case proceed to formal hearing. (SOF ¶ 21). Notice of the Investigators' findings were sent to Plaintiff and Complainant on September 14, 2020. (SOF ¶ 22).

### D.    Prehearing Proceedings.

On September 24, 2020, Assistant Dean and Director of Student Accountability Angela Ibrahim-Olin assigned Kristin Parks to adjudicate Doe's case. (SOF ¶ 23). That same day, Ibrahim-Olin notified Plaintiff and Complainant that Parks had been chosen as the Adjudicator and of the tentative hearing dates. (SOF ¶ 23). The letter clearly outlined how the hearing would proceed. (*Id.*). Specifically, it noted that

> The facts and circumstances supporting the allegation were described in the Investigation Report. Please be advised that the Adjudicator's authority to determine the facts of the case is not limited to the findings outlined in the report. As the Charging Officer, Ms. Gibson reserves the right to supplement the list of witnesses and the list of exhibits with additional exhibits and witnesses. In the event the list is changed, you would be notified in a timely manner.

9

During the hearing, each party will have the opportunity (1) to present their account of the alleged incident; (2) to present witnesses and evidence on their behalf; (3) to hear a witness testify if a witness appears and testifies; (4) to review and comment on any documents or other evidence submitted as evidence at the hearing; (5) to have an attorney and/or advocate attend the hearing; and (6) to submit to the hearing officer questions for witnesses on topics that are relevant, material, and not unduly repetitive.

During the proceeding, the Adjudicator will ask questions of each witness. Prior to the hearing, Ms. Gibson will submit a list of proposed questions to the Adjudicator to be read to you and to the other witnesses. When another person is testifying, you will have the opportunity to submit proposed questions to the Adjudicator.

(SOF ¶ 25).

Pretrial conferences were held on October 7 and October 26, 2020. (SOF ¶ 26). Plaintiff's attorneys Trever Hook and William Kutmus attended, as did Parks, Gibson, and Plaintiff. (*Id.*). In an email summarizing the October 7, 2020, pretrial hearing, Parks described her role as adjudicator:

*It should be noted that under the University of Iowa's 2019-2020 procedures the "adjudicator's role is to address prehearing matters, to preside over the hearing, to ask questions of the witnesses, to resolve evidentiary issues and disputes, and to ultimately determine whether a University policy violation has occurred." Constitutional issues can and should be made for the purposes of a record but will only be noted and not decided by the adjudicator...

(SOF ¶ 28). In response to the Adjudicator's email, Plaintiff's attorneys submitted a statement of written objections to the manner of the proceeding. (App. 121-22). Those objections included (1) that the new Title IX rules should apply to Doe's case, rather than the old rules; (2) that the assault occurred off-campus and under the new rules the University would not have jurisdiction over the complaint; (3) that Doe should have the right to directly cross-examine all witnesses against him; and (4) that the Adjudicator should not be allowed to review a copy of the Investigative Report. (*Id.*). Doe went on to state that if the proceeding went on as planned, the

10

University would violate Doe's constitutional rights to confrontation and to fundamental fairness. (*Id.*). Doe also argued that the "Title IX alleged violations are quasi-criminal in nature and the burden of proof should be by clear and convincing evidence." (*Id.*).

Gibson submitted the University's witness and exhibit lists on October 26, 2020, as well as the rules and procedures that would govern the upcoming hearing. (*Id.*). Plaintiff's attorneys also submitted their witness and exhibit lists. (SOF ¶ 29).

During the October 26, 2020, pretrial conference, Parks acknowledged that Plaintiff's attorneys had submitted written objections to conducting the hearing under the 2019-2020 rules rather than the rules enacted on August 14, 2020. (SOF ¶ 32; *see* App. 121-22). Parks noted Counsel's objections and decided to proceed under the 2019-2020 rules and procedures.[3] (*Id.*). Parks further instructed that expert witness testimony would be allowed and noted the University's objection to that testimony for the record. *Id.*

On October 27, 2020, Plaintiff's attorneys submitted the CV for their expert witness, psychiatrist Dr. Donner Dewdney. (SOF ¶ 35). Plaintiff's attorneys submitted their questions for the University's witnesses on November 6, 2020. (SOF ¶ 36). The University submitted its questions for Respondent's witnesses on November 7, 2020. (SOF ¶ 37).

---

[3] This decision was correct, as the United States Department of Education's Office for Civil Rights has explicitly instructed that the August 14, 2020, regulations do not apply retroactively to misconduct which occurred prior to that date. *See* OCR, *Questions and Answers Regarding the Department's Final Title IX Rule* (Sept. 4, 2020), available at https://www2.ed.gov/about/offices/list/ocr/docs/qa-titleix-20200904.pdf.

### E.      The Hearing.

Doe's case proceeded to hearing on November 9, 10, and 11, 2020.  (SOF ¶ 38). The Adjudicator heard from thirteen witnesses, including Doe and his expert. (App. 484-1426). Doe was represented by counsel throughout the hearing. (App. 1484, at 59:2-6). Doe's attorneys made objections and arguments on his behalf throughout the hearing. (App. 1484, at 59:7-15; 61:8-15). Doe was allowed to present witnesses on his behalf during the hearing, including one expert witness. (App. 1484, at 59:16-60:10). Both parties submitted additional questions for witnesses during the course of the hearing. (App. 175-87); (App. 1484, at 60:11-25). Adjudicator Parks was present throughout the hearing, listened to evidence, and reviewed exhibits during the hearing. (App. 1484, at 61:1-7). Closing arguments were made on November 16, 2020. (App. 1345-1426).

### F.      Sanctions Issued.

The Adjudicator's decision was released on January 5, 2021. (SOF ¶ 47). The decision was amended due to a redaction oversight and released again on January 7, 2021. (SOF ¶ 47). The decision included lengthy findings of fact, summaries of all witness testimony (including rationale for credibility assessments of each), as well as analysis of the relevant facts. (App. 188-229). After hearing all of the evidence, the Adjudicator found by a preponderance of the evidence that:

> Sometime throughout the evening of October 31, 2019 and into the early morning hours of November 1, 2019:
>
> 1.   The Reporting Student was incapacitated due to the influence of alcohol or other drugs;
>
> 2.   That the Responding Student engaged in sexual activity with the Reporting Student, whom he knew or reasonably had a basis to know was incapacitated.
>
> 3.   That the sexual activity involved penal penetration.

> Accordingly, the undersigned finds the Responding Student is responsible for violating Rule D.13 and Rule D.23 of the Code of Student Life.  This includes violating Rule 2.3 of the Policy on Sexual Misconduct, Dating/Domestic Violence, or Stalking Involving Students.

(SOF ¶ 48). Ibrahim-Olin issued sanctions on the same day, expelling Plaintiff from the University of Iowa effective immediately. (SOF ¶ 49). In her sanctions letter, Ibrahim-Olin included information describing the appeal procedures and instructed Doe that any petition appealing the Adjudicator's decision "must be received no later than ten (10) business days following the decision date." (SOF ¶ 50).

### G.  Doe's Appeal to the Provost.

Doe submitted his petition appealing the Adjudicator's decision on January 22, 2021. (SOF ¶ 51). The Complainant declined to submit a response to Doe's appeal. (SOF ¶ 52). Ibrahim-Olin notified the parties that the Associate Provost, Tanya Uden-Holman, would "review all of the evidence before issuing their decision, which will be based on the totality of the record." (SOF ¶ 53). Uden-Holman's decision was to be submitted within ten (10) days following the receipt of the appeal. (*Id.*). Uden-Holman requested two extensions of her deadline and submitted her decision on February 25, 2021. (SOF ¶ 56). In her decision, Uden-Holman upheld the Adjudicator's decision and imposed sanctions. (SOF ¶ 58).

The parties were notified of their right to appeal the Associate Provost's decision to the Board of Regents. (SOF ¶ 59).

### H.  Doe's Appeal to the Board of Regents.

Doe appealed the Associate Provost's decision to the Board of Regents on March 5, 2021. (SOF ¶ 60). The University had twenty (20) days to file the institutional record and a written response. (SOF ¶ 61). Complainant also had twenty (20) days to file a written

response. (*Id.*). On March 19, 2021, the University submitted its written response to the appeal with exhibits A and B attached. (SOF ¶ 63). The Board issued a scheduling order on March 26, 2021, outlining due dates for objections and requests to supplement the record, and written briefs. (SOF ¶ 64). On March 27, 2021, Plaintiff submitted his brief. (SOF ¶ 65). The Board revised the scheduling order extending the deadline for Complainant's and University's written briefs to April 20, 2021. (SOF ¶ 66). The University submitted its brief on April 18, 2021. (SOF ¶ 67).

On June 4, 2021, the Board unanimously affirmed the Associate Provost's decision. (SOF ¶ 68). The Board's decision constituted final agency action. (SOF ¶ 69).

## III.   LEGAL STANDARD

The Court must grant Defendants' Motion for Summary Judgment if it finds that there is no genuine issue of material fact for trial. F.R.C.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court may find that there are no genuine issues of material fact where a disputed issue "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. Where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). However, if the Court finds that there are disputed issues of material fact, those "facts must be viewed in the light most favorable to the nonmoving party." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (internal quotation marks and citations omitted).

To survive Defendants' Motion for Summary Judgment, Plaintiff may not rest upon the bare allegations in his pleading, but must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. However, in presenting his evidence Plaintiff may not rely on materials which would be inadmissible at trial. *Moore v. Indehar*, 514 F.3d 756, 758 (8th Cir. 2008). Nor can he rely on speculation, as "[m]ere speculation is insufficient to defeat summary judgment." *Campbell v. Kraft Heinz Food Company*, 465 F. Supp. 3d 918, 924 (S.D. Iowa 2020). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial" and the moving party is entitled to judgment as a matter of law. *Torgerson v. City of Rochester,* 643 F.3d 1031, 1042-43 (8th Cir. 2011) (*en banc*) (internal quotation marks and citations omitted).

## IV.   ARGUMENT

### A.   This Court Should Grant Summary Judgment to Defendants on Plaintiff's Title IX claim.

Doe claims that the University, through its implementation of its student disciplinary process, discriminated against him on the basis of his sex in violation of Title IX. Title IX instructs that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." *Does 1-2 v. Regents of the Univ. of Minn.*, 999 F.3d 571, 577 (8th Cir. 2021) (quoting 20 U.S.C. § 1681 (a)). Importantly, "Title IX is not an invitation for courts to second-guess disciplinary decisions of colleges or universities." *Doe v. Univ. of St. Thomas*, 240 F. Supp. 3d 984, 989 (D. Minn. 2017). To survive summary judgment on his Title IX claim, Doe must "set forth sufficient evidence to allow a reasonable jury to find that [UI] disciplined

him on the basis of sex." *Rossley v. Drake Univ.*, 979 F.3d 1184, 1192 (8th Cir. 2020), *cert. denied,* 141 S. Ct. 1692 (2021). Doe may use two theories as a vehicle for his evidence: a selective enforcement theory or an erroneous outcome theory. *See Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994); *Doe v. Purdue University*, 928 F.3d 652, 667-68 (7th Cir. 2019) (clarifying that *Yusuf's* selective enforcement and erroneous outcome categories were merely methods of proving sex discrimination rather than independent claims themselves)).

Here, Doe provides a laundry-list of complaints that he was treated less favorably by UI because of his gender, including that UI failed to provide him a "fair and impartial" investigation, hearing, and appeal; denied him due process; intentionally steered the investigation and disciplinary proceedings to support a predetermined conclusion; treated him less favorably in the investigation and discipline than others of different genders; and wrongly found that he had violated the Code of Student Life. (Am. Pet. ¶ 45). Doe appears to make use of both Title IX theories in crafting his complaint. First, he argues under a selective enforcement theory, stating that UI selectively enforced its policies to the detriment of male students. Second, he frames an erroneous outcome theory, arguing that UI did not follow its policies and procedures in administering the student disciplinary process, which resulted in an erroneous outcome motivated by gender bias. This section will explain why Doe's claims fail under both theories.

### 1. Doe's Selective Enforcement Claim Fails.

Doe's selective enforcement claim is based on his perception that UI treated the complaining party ("Complainant") more favorably throughout the pendency of his student disciplinary process. Doe infers, without any supportive evidence other than the fact that Complainant is female and he is male, that this perceived different treatment was

the result of gender bias. According to Doe, the different treatment took two forms, including (1) UI employees' harsher demeanor and affect when communicating with Doe, and (2) UI's alleged provision of benefits and assistance to Complainant that were not also provided to Doe.

A selective-enforcement theory under Title IX is premised on a finding that "regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Doe v. Dordt University*, 616 F. Supp. 3d 872, 899 (N.D. Iowa 2022) (citing *Yusuf*, 35 F.3d 709 (2d Cir. 1994); *Doe v. Purdue University*, 928 F.3d 652, 667-68 (7th Cir. 2019)). To prove selective enforcement, a male plaintiff like Doe must show (1) a female student was in circumstances sufficiently similar to his own, and (2) that the defendant university treated this female comparator more favorably. *Doe v. Dordt University*, 616 F. Supp. 3d at 899 (citing *Doe v. Washington Univ.*, 434 F. Supp. 3d 735, 757 (E.D. Mo. 2020)). Notably, Doe may not simply point to any female accused of violating the Sexual Misconduct Policy or Code of Student Life.  Rather, he must identify a female student who was accused of substantially similar conduct—i.e., sexual assault of an incapacitated student—and must demonstrate that the female student identified received more favorable treatment by the University during her disciplinary process. *See id.* at 899-901 (finding that the proffered comparators were not "similarly situated" to maintain a selective enforcement claim because they were not accused of substantially similar policy violations).

Doe has not established a comparator in this case,[4] and even if he had he has not

---

[4] At the time of his deposition, Doe was unable to provide any evidence relating to treatment of female responding parties at the University of Iowa. (App. 1476, at 28:22-29:8; 30:21-31:10 ("I don't have any knowledge on the statistics of what the – of how the

sought information in discovery which would establish different treatment on the basis of

gender.[5] None of the cases revealed during discovery are sufficiently similar to offer a

proper comparator for Doe. (App. 1427). Between 2018 and 2021, only one female student

was accused of sexual assault. That student was accused of kissing her ex-boyfriend on

the mouth without his consent while he was intoxicated and repeatedly vomiting in a

dorm bathroom. (App. 37-62). She was also accused of having violated UI's policy

prohibiting stalking. (App. 53). The investigator assigned to the case[6] found both parties

---

University of Iowa treats males in these types of situations, but the way I was treated was
just harassing, discriminating. It was pretty obvious from the beginning."). Subsequent
to this testimony and in response to Plaintiff's discovery requests, Defendants produced
a chart which outlined all female responding parties to sexual misconduct allegations, the
related charges, the findings, and the sanctions issued for each. (App. 1427). Only one
female responding party has been formally accused of sexual assault during the relevant
time period.

[5] Plaintiff's Interrogatory No. 14 requests that Defendants:

> Identify all cases where a female was accused of a sexual based offence
> under the Defendant University of Iowa code of student conduct and
> include minimally the offense, the findings and the punishment.  Further
> identify all documents responsive to this interrogatory.

Defendants provided the requested information. (App. 1427). It is of limited utility,
however, because Plaintiff did not properly seek to depose UI employees or obtain
additional case files related to claims of sexual misconduct against female responding
parties to gather a deeper understanding of the nuances of those cases. *See Rossley*, 979
F.3d at 1194-95 (indicating that courts must be cautious in relying on statistical data to
demonstrate gender bias where the full context is unavailable from the face of the data).

Plaintiff did serve an overbroad request for production, RFP No. 9, to which Defendants
provided a timely objection. Plaintiff did not respond to narrow his request in such a way
that Defendants could answer it in good faith. Discovery is now closed, and Plaintiff is
barred from seeking additional information related to that request. Defendants did,
however, provide a redacted copy of the case file relating to the one female responding
party who had been accused of sexual assault. (App. 1500-2064). A review of that file
reveals that the female responding party was not accused of substantially similar conduct,
and even if the Court finds that the conduct was substantially similar, it will be unable to
find any favorable treatment.

[6] Krista Kronstein served as the investigator in this case. (App. 22-24).

to be credible, but found the male reporting party was more credible with regard to most topics. (App. 54). Ultimately, however, the investigator could not find, by a preponderance of the evidence, that the alleged unwanted kiss had occurred. (App. 58).

In making her determination that the male reporting party's sexual assault claim could not be substantiated, the investigator considered both parties' statements of their recollection of events as well as testimony from other individuals who witnessed snippets of the activity at issue. (App. 37-62). Witnesses corroborated that on the night in question the male reporting party was repeatedly vomiting all over the bathroom and himself. (App. 58). Further, witnesses did not observe the female responding party attempting to kiss the reporting party. *Id.* The investigator found the responding party's testimony that she would not kiss someone on the mouth after that person had vomited--and was continuing to vomit--particularly compelling. *Id.* The investigator also noted that, like in the instant case, the reporting party was intoxicated and the investigator could not rely solely on his testimony in determining what happened that night. *Id.* Though she dismissed the sexual assault charge, the investigator did find that the female responding party had violated rules D.13 (Violation of University Policy) and D.24 (Stalking) of UI's Code of Student Life. *Id.* Because the sexual assault complaint was dismissed, the case was not referred to hearing and the investigator issued sanctions accordingly. *Id.*

Nothing about the female responding party's case suggests that she engaged in behavior of the same level of severity as Doe. She was accused of harassing the reporting party after a breakup by going to his room in a drunken, belligerent state, and of kissing him while he was drunk. Doe, on the other hand, was accused of isolating a drunk and high young woman in his bedroom and having sex with her without her consent. Furthermore, the parties in both cases received identical process via notice of the charges

against them and a thorough, unbiased investigation into their claims. As a result, there can be no finding that the female responding party was treated more favorably by the University, or that any favorable treatment was the result of gender bias. Therefore, Doe's Title IX claim cannot be established under a selective outcome theory and must be dismissed.

### 2. Doe's Erroneous Outcome Claim Fails.

Another method for establishing a Title IX violation is via proof that the University's adjudicative process was so flawed that it resulted in an erroneous outcome. "Plaintiffs who claim that an erroneous outcome was reached must allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding." *Yusuf*, 35 F.3d at 715. However, Plaintiff may not simply provide evidence of a flawed proceeding in conjunction with "a conclusory allegation of gender discrimination." *Id.* Rather, Plaintiff must provide a "particularized allegation relating to a causal connection between the flawed outcome and gender bias." *Id.* In other words, Plaintiff must provide evidence of particular circumstances that suggest that gender bias was a motivating factor behind the erroneous finding. *See id.* Doe appears to make two arguments in support of his erroneous outcome theory. First, he claims that UI's disciplinary record contains clear procedural irregularities which can be causally linked to his gender. Second, he claims that the Individual Defendants exhibited gender bias and confirmation bias through their different treatment of Doe.

### a. Clear Procedural Irregularities

A plaintiff may establish an erroneous outcome claim via various types of evidence which establish clear procedural irregularities in a university's investigation and adjudication which disfavor the male student. *Doe v. Dordt University*, 616 F. Supp. 3d

872, 897 (N.D. Iowa 2022). Here, Doe has alleged that his student disciplinary process was infected with procedural irregularities that are evidence of gender bias. (Am. Pet. ¶¶ 41-46). However, Plaintiff has entirely failed in his Petition, discovery responses, deposition testimony, or underlying appeal briefs, to point to any action taken by Defendants which are "irregular" or outside the scope of its policies or procedures. (*See* Am. Pet.; App. 1428-68 (Plaintiff's Interrogatory Responses); App. 1469-98 (Doe Deposition); App. 239-79[7]; App. 428-83)). Without such a showing, Doe's claim under this theory necessarily fails.

In her decision on Doe's appeal, Associate Provost Uden-Holman correctly summarized UI's adherence to its policies as well as the significant process afforded Doe throughout the disciplinary proceedings:

> You participated in the investigation process and were represented by counsel throughout. You submitted your written witness statement on April 29, 2020, and participated in a Zoom interview with investigators on May 28, 2020. Both parties were given the opportunity to provide witness names. The investigators interviewed thirteen (13) witnesses identified by the parties who were believed to have information relevant to the incident in question, including four (4) witnesses identified by you. The investigators further considered documentary evidence. Based on the information received during the investigation, investigators found the preponderance of the evidence showed that you violated the Sexual Misconduct Policy and Code of Student Life. As a result, they recommended that your case proceed to a formal hearing. I find no due process or procedural error related to the investigation.
>
> You then participated in a multi-day hearing before an independent adjudicator, who hears student misconduct cases *de novo.* You were represented by your attorneys, and evidence was presented through sworn witness testimony and exhibits. The witnesses were asked questions by the adjudicator. You had the opportunity to submit questions for all of the witnesses prior to and throughout the hearing.

---

[7] Doe submitted two appeal briefs as part of the administrative process: one to the Provost and one to the Board of Regents. Except for the introductory page and grounds for appeal, the briefs are nearly identical. *Compare* App. 239-79 *with* App. 316-39.

As set forth in the Student Misconduct Procedure, Section 12(H)(9), the adjudicator has the discretion to receive or exclude evidence. Again, administrative hearings are not subject to the formal or technical rules of evidence. Id. ("The adjudicator's decision may be based upon evidence that may be inadmissible in a criminal or civil court. Irrelevant, immaterial, or unduly repetitious evidence should be excluded.") Your attorneys objected to several exhibits, and they are denoted in the adjudicator's report with an asterisk as required. *Id.* The adjudicator further was within her authority and discretion to stop continued testimony by Dr. Dewdney extrapolating his general knowledge about certain disorders to this Reporting Party, whom he has never met or professionally examined, and to deny an "offer of proof" for which there is no procedure in this administrative process.

With respect to the SANE report, all parties stipulated that the lack of lab results that would indicate the presence/absence of semen or the presence/absence of drugs or alcohol in the Reporting Party's system was due to the fact that a criminal case was not pursued by the Reporting Party.

Importantly, on the final day of the hearing (November 16, 2020), at the time stamp of approximately 1:48:01, the adjudicator asked all parties if they had any other concerns about any witnesses or evidence. Your attorney, Mr. Kutmus, said, "no" as did the charging officer, Ms. Gibson. When asked if you had any questions, you said "no."

I find that you were afforded due process and no procedural error resulted in prejudice to you.

(App. 293-94). Doe does not appear to have complaints about any significant part of the process. He admits that he was represented by his attorneys at the hearing. (App. 1484, at 59:2-6). He admits that his attorneys made objections and arguments on his behalf. (App. 1484, at 59:7-15; 61:8-15). He admits that he was permitted to present witnesses on his behalf. (App. 1484, at 59:16-60:10). He admits that his attorneys had the opportunity to provide questions to be asked of the witnesses. (App. 1484, at 60:11-25). He admits that the Adjudicator was present during all of the testimony and appeared to review exhibits during the hearing. (App. 1484, at 61:1-7). Finally, he admits that his attorneys made objections to exhibits during the hearing. (App. 1484, at 61:8-15).

Many of Doe's procedural complaints appear to revolve around the fact that UI's

Student Judicial proceedings are administrative processes rather than criminal proceedings. In his underlying appeal briefs to the Provost and the Board of Regents, Doe's attorneys make complaints about the use of the preponderance of the evidence standard,[8] the Adjudicator's dual role as a factfinder and duty to make credibility determinations, the unavailability of direct cross examination by the attorneys,[9] the Adjudicator's rejection of hearsay objections and offers of proof, the Adjudicator's rejection of character evidence, and the limitation of Plaintiff's expert psychiatrist testimony. (App. 239-79; 315-39; 418-420). Plaintiff's arguments are fundamentally flawed, because the University of Iowa is not required to provide a full criminal trial for each student accused of violating its student misconduct policy. *Jones v. Snead*, 431 F.2d 1115, 1117 (8th Cir. 1970) (quoting *Esteban v. Cent. Mo. State Coll.*, 415 F.2d 1077, 1089 (8thCir. 1969)).

Doe is especially concerned that his expert witness, psychiatrist Dr. Donner Dewdney, was not allowed to present his complete testimony at the hearing. (App. 1479, at 41:6-14; App. 250-56). Doe argues that Dewdney was not allowed to offer all of his testimony "because it was proffered on behalf of a male student." (Am. Pet. ¶ 23); (App. 1482-83, at 53:12-56:13). Doe offers no evidence or explanation for this assertion. (*See id.; see also* App. 1483, at 56:31-57:12 (Doe unable to present evidence that "female students are allowed to present expert testimony in disciplinary proceedings"). An even

---

[8] The preponderance of the evidence standard was required under the Title IX rules applying to Doe's case. *See* United States Department of Education Office for Civil Rights, Letter of April 4, 2011 (https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf).

[9] Direct cross-examination by the attorneys was not required under the Title IX rules applicable to this case. *See Doe v. University of Arkansas-Fayetteville,* 974 F.3d 858, 867-68 (8th Cir. 2020).

cursory review of Dewdney's hearing testimony[10] reveals that his otherwise lengthy testimony was briefly cut off on one line of questioning. (App 1385-87 (Dewdney Testimony at 41:12-43:22)). Defendant Gibson objected after Dewdney diagnosed Complainant with a never before diagnosed personality disorder and tried to opine on her alleged previous (and totally irrelevant) self-harm behaviors. (App. 1385-87 (Dewdney Testimony at 41:12-43:22)); *see Doe v. University of Nebraska*, 451 F. Supp. 3d 1062 (D. Neb. 2020) (upholding decision to exclude information about complainant's mental state because "[m]ental illness is not a generic badge of incompetence or dishonesty" and in order to be admissible, the mental illness evidence at issue must be in some way relevant to the issue of consent). The exclusion of additional elaboration on this testimony was not prejudicial to Plaintiff, had nothing to do with whether Complainant was incapacitated on the night of the assault, and is not evidence of gender bias.

Further, Dr. Dewdney *was permitted* to provide his testimony, based on his training and experience, on a wide range of topics. He provided his analysis of whether the Complainant was incapacitated by drugs and alcohol at the time of the assault. (App. 1365-72, (Dewdney Testimony at 21:13-28:20; App. 1380-81, at 36:21-37:25 (Dr. Dewdney opining that "she was not incapacitated and could form intent.")). He was asked his opinion about key pieces of evidence, such as Complainant's request during the assault that Plaintiff contact her via SnapChat, several of her comments, being confronted by her then-boyfriend, and her inconsistent recollections regarding how much alcohol and marijuana she had ingested. (App. 1365-82 (Dewdney Testimony at 21:13-38:15)). The Adjudicator also asked questions about his understanding of amnesia, or a "drug- or

---

[10] The entirety of Dewdney's testimony can be found at App. 1349-1404.

alcohol- induced blackout," and whether the Complainant suffered an extreme psychological shock at the time of the incident which witnesses mistook for inebriation. (App. 1376-77 (Dewdney Testimony at 32:10-33:22; App. 80, at 36:4-20)). He testified about conversion disorders and his belief that Complainant was violently ill after the incident because of her anxiety rather than having ingested a substantial amount of alcohol and THC. (App. 1388-90 (Dewdney Testimony at 44:10-46:17)). The Adjudicator even asked Dr. Dewdney to discuss his opinion that UI's investigators suffered from confirmation bias in referring Doe's disciplinary process to hearing. (App. 1383-85 (Dewdney Testimony at 39:7-41:3)). The Adjudicator properly limited Dr. Dewdney's irrelevant, unsupported, and harmful testimony about the Complainant's alleged prior self-harm, and that decision was not prejudicial to Doe or evidence of gender bias.

Doe also takes issue with his disciplinary hearing being conducted via Zoom due to the Covid-19 pandemic. (App. 1481, at 47:19-48:22). He believes that the Zoom format impeded the Adjudicator from properly observing his body language and demeanor, but agrees that the parties and witnesses for each party appeared via Zoom. (*Id.*).[11] He further notes that he believed that it was unfair that the Complainant was allowed to turn off her camera and microphone during the Zoom hearing, while he was required to leave his on. (App. 1476, at 26:20-28:21). Defendants were only able to find one instance in which Complainant's camera was briefly turned off. (App. 886-87 (Adjudicator asking if she should wait for Complainant, Ms. Gibson responding "She's coming back.")). In fact, the Adjudicator explicitly instructed the parties prior to the hearing that "both responding and reporting parties (if they chose to participate) will need to have their own zoom

---

[11] Notably, Iowa courts routinely hold contested hearings via video conferencing systems such as Zoom and GoToMeeting.

window and be visible to the adjudicator throughout the proceedings." (App. 127).[12] Notwithstanding the fact that Doe apparently did not ever request to turn off his camera or microphone, he concedes that he is uncertain whether being allowed to turn off his microphone and camera during the hearing would have changed the University's determination on his case and believes that even if the hearing had been held in person, it would have been "set against" him. (App. 1481, at 48:11-15).

None of the "procedural irregularities" Doe complains about in his Amended Petition or underlying appeal brief are substantiated by the record or actually contrary to UI's policies or procedures. (App. 239-79; App. 315-339; App. 428-83).  The University is not required to provide a criminal process to students accused of sexual misconduct. *See Snead*, 431 F.2d at 1117. As a result, this Court should disregard Doe's erroneous outcome argument and dismiss his Title IX claim.

### b.  *Individual Defendants' Gender Bias Was Evident Through Their Obvious Different Treatment of Doe*

Doe may also attempt to establish his erroneous outcome claim by establishing that particular university official's actions during a disciplinary proceeding raised a plausible inference of gender discrimination. *See Rossley*, 979 F.3d at 1193-94. Here, Doe seems to allege that the individual Defendants behaved in such a way as to reveal their gender-bias, and that their bias led them to make a decision that was against the substantial weight of the evidence.

Doe is largely unable to provide examples of gender-based different treatment by

---

[12] At one point, the Adjudicator did offer the Complainant the option of turning her screens off to "take a break" as needed. (App. 701, at 61:2-8). In so doing, she offers to wait to continue the proceedings until Complainant has returned to the hearing with her camera engaged. Defendants were unable to find any requests by Plaintiff to turn off his camera, though his requests for breaks were regularly granted.

the individual Defendants. Instead, he provides generalized and unsubstantiated complaints about systematic discrimination against men in UI's student disciplinary process. (App. 1477, at 30:21-31:10 (generalized complaints about "harassment" and "discrimination"); App. 1478, at 34:8-36:15 (Doe explaining that his understanding of poor treatment of men in student disciplinary proceedings comes from online research and is not based in any information about the University of Iowa); App. 1478-79, at 36:16-40:10 (Doe attempting to explain his belief that female adjudicators and investigators cannot provide a fair disciplinary process, but failing to give specific examples of the ways in which he was prejudiced by the team that administered his process).[13] Doe claims that Krista Kronstein, Kristal Gibson, and Adjudicator Kristin Parks[14] treated him more harshly throughout the process than they treated the Complainant, but even these claims about individual conduct are over-generalized. Despite having both transcript and video recordings of the hearing, Doe was unable to provide examples of specific instances of concerning conduct during his deposition, in his discovery responses, or in his Amended Complaint.

### i. Kronstein

Doe complains generally about Kronstein's demeanor. (App. 1472, at 11:13-13:10 (Doe testifying that the questions Krista Kronstein asked him during his first interview were "offensive" and that her communication style was abrupt, but unable to recall any

---

[13] During his deposition, Plaintiff repeatedly defaulted to a canned statement that "It's a systematic problem.  The government – the regulations that are set in place, the University of Iowa, their rules and regulations that they set in place are biased against males."  (*See, e.g.,* App. 1478, at 37:15-22; App. 1479, at 39:1-7). Doe ultimately admitted that he did not believe that the outcome of the hearing would have been different if his adjudicator or investigators had been men. (App. 1479, at 38:21-24).

[14] Ms. Parks was not named as a Defendant in this case.

particular offensive question); App. 1476, at 26:20-28:21; App. 1479, at 38:13-20 (Complainant asked leading questions while Doe treated harshly and unfairly); 79:2-80:5)). These complaints are unsupported. Because the burden lies with Plaintiff to come forward with admissible evidence in support of his claim, and because he cannot do so, this claim should be dismissed.

 *ii. Gibson*

Similarly, Doe complains broadly about Gibson's "demeanor" without any citation to the record. (App. 1479, at 40:11-5; (Gibson's "demeanor the whole time was very . . . against me[.] She did not really - - she made a lot of facial expressions that showed that she didn't believe my side at all or value it."); App. 1489, at 81:12-15 (Doe recalls Gibson laughing during his testimony)).[15] Doe claimed that at one point, Gibson

> threw her hands in the air and . . . it wasn't really verbal. It was more of what she was doing.  I mean, she did call some of the stuff they were doing inappropriate and she was very kind of argumentative, I would believe.

(App. 1479, at 41:17-25). Doe complains that Gibson also paid particular attention to the Complainant's emotional state while ignoring his own. (App. 1489, at 80:6-16). Notably, even if Plaintiff's testimony is true and Gibson spent the hearing making faces at him, throwing her hands in the air, and laughing, Doe has provided no evidence that she did so because he is a man.  Further, she did not serve as the factfinder. Her role was to "coordinate the presentation of witnesses and evidence against the accused student, and urge the adjudicator to find the accused student responsible for" the alleged violation(s). (App. 456; SJP, § 12(B)).

---

[15] Defendants have been unable to find any video of Gibson laughing during Plaintiff's testimony.

### iii. Parks

The thrust of Doe's claim relating to Parks is that she did not accept his version of events and unjustifiably determined that he lacked credibility. (App. 239-79; 315-39; 418-420; App. 1485-86, at 65:13-66:17; App. 1488-89, at 77:7-78:8 (Doe arguing that UI found Complainant's male witnesses credible because they were associated with her, and his male witnesses not credible because they were associated with him)). As the factfinder, Parks had a duty to make credibility assessments.

Doe accuses Parks of bias because of the way she phrased questions to him, which he contrasts with the way she asked questions of Complainant. (App. 1480, at 43:4-44:2; App. 1488, at 76:3-77:11). Doe believes Parks's questioning was "very unfair." (*Id.* (Doe believes Parks's questions about marijuana use were unfair because they made his friends out to be criminals while not making the same insinuations about Complainant's witnesses)). Doe further claims that Parks's questions were overall "very discriminatory and harassing" and that at one point she offended him when she kept asking him "Is that really your testimony?"[16] (*Id.*).  Again, despite having access to both video recordings of

---

[16] Defendants located only one instance in which Ms. Parks asked Plaintiff:

> Q: So it's really your testimony that taking this girl, who you were attracted to, into your room after having a nice conversation with her—it's your testimony that you weren't thinking anything sexual was going to happen until right before the moment it actually happened?

> A. Yes. I didn't think anything was going to happen.

App. 1318.  This exchange is not evidence of gender bias.  The Adjudicator's role was to gather evidence and it was appropriate for her to press witnesses on testimony that was confusing or incomplete.  She did the same thing repeatedly with other witnesses. (*See, e.g.* App. 788-89, at 42:23-43:17 (Adjudicator pressing witness for Complainant on prior testimony)).

the hearing and hearing transcripts, Doe offers no citation which might assist the parties in confirming his claims.

Defendant also claims that the Complainant received benefits in the student disciplinary process that he did not receive. For example, he claims that UI contacted the Complainant and her witnesses "multiple times" during the investigation process but did not offer him the same courtesy. (Am. Pet. ¶ 13); (App. 1473, at 15:5-16:23). At the time of his deposition, Doe had no evidence to support this claim. (*Id.*). He also claims that the Investigators failed to interview a friend of his who was present the night of the assault and that he was disadvantaged by their failure to do so. (App. 1474-76, at 20:21-26:14).[17] However, at the time of his deposition, Doe was unable to provide any information about what evidence this individual might provide, other than his general speculation that the individual would tell "the truth." (*Id.*).

Finally, Doe complains that another witness—Witness E—was not compelled to testify at the hearing. (App. 910-12, at 5:15-7:25). When Plaintiff's attorney raised the issue, the Adjudicator explained that she did not have the authority to compel a student to testify or to dole out consequences for failing to testify. (*Id.*). Contrary to Plaintiff's characterization, she attempted to work with the parties to enter notes from the witness's prior interview, and suggested that Plaintiff could submit interrogatories to the student. (*Id.*). She also agreed to give Mr. Kutmus, Plaintiff's attorney, the student's contact information so that Plaintiff could reach out to see if the student would be willing to testify at his request. (*Id.*). When the student did not respond to Mr. Kutmus's inquiries, he then

---

[17] The Investigators' notes from their May 28, 2020, interview with Doe reveal that Doe believed this witness had the same views as the rest of his roommates. (App. 35). In their notes, Defendants Kronstein and Gibson explicitly note: "He's a friend, but he had same viewpoint as rest of roommates. (didn't seem to be requesting us to talk with him)." (*Id.*).

objected to the interview notes being entered into evidence (before ultimately offering them himself).   (App. 1027-30).   Contrary to Plaintiff's characterization, UI went above and beyond to provide Plaintiff with access to this witness. Because this claim is belied by the record, the Court should decline to consider it.

### iv.  Uden-Holman's Appeal Decision

In his appeal to the Provost,[18] Doe criticizes the Adjudicator's analysis and provides parenthetical commentary regarding UI's perceived missteps throughout the student disciplinary process (App. 239-311). The underlying record in this case shows that Doe's claims are either unsupported by the evidence or insufficient to call into question the accuracy of the UI's conclusions.

Doe attributes the University's findings against him to gender-based animus, but has failed to present any evidence that UI's credibility determinations were gender-based. In fact, the Adjudicator found other male-identifying students' testimony credible and relied on it in making her determination. (App. 199 (finding Witness B, Complainant's male ex-boyfriend, particularly credible)). And in her decision on Doe's appeal, Associate Provost and Dean Tanya Uden-Holman outlined her rationale for determining that much of Doe's testimony was not credible, including that his testimony regarding key pieces of evidence was "inconsistent and changed over time." (App. 290). Uden-Holman then cited specific examples of Doe's inconsistent testimony. (App. 290-91).

In her decision on Doe's appeal, and after a thorough review of the record,[19] Uden-

---

[18] In his Response to Defendants' Interrogatory No. 10, Plaintiff incorporates by reference the arguments made in his briefs in support of his appeals to the Provost and to the Board of Regents. (App. 239-79; 315-39).  The arguments made in both briefs are substantially similar. (*Id.*).

[19] Doe admits that he has no reason to believe that Uden-Holman lied about engaging in a thoughtful review of the entire file prior to deciding his appeal. (App. 1487, at 73:5-17).

Holman also discussed multiple categories of substantial evidence which supported the Adjudicator's decision in Doe's case. First, Uden-Holman determined that Doe's evidence related to the Complainant's motive was "belied by the record" and that the Complainant and others' testimony demonstrated that Complainant's version of events was more credible. (App. 291). Second, she determined that the evidence in the record demonstrated that a reasonable person in Doe's position would have been aware that Complainant was incapacitated by alcohol both before and during the sexual assault. (*Id.*). Third, she outlined her rationale for agreeing with the Adjudicator that Doe's expert witness, Dr. Dewdney, could not reliably provide testimony relating to the Complainant's mental health without having met her or examined her. (App. 293-94). None of Dr. Uden-Holman's rationale is based in a consideration of gender.

Even if Doe is correct and the Adjudicator and/or Investigators had a "harsh" demeanor when interacting with him and a "kind" demeanor when interacting with the Complainant, and even if they found the Complainant and her witnesses more credible than Plaintiff and his witnesses, that different treatment is not evidence of gender discrimination. *Rossley*, 979 F.3d 1194-95 (citing *Sahm v. Miami Univ.*, 110 F. Supp. 3d 774, 778 (S.D. Ohio 2015) ("Demonstrating that a university official is biased in favor of the alleged victims of sexual assault claims, and against the alleged perpetrators, is not the equivalent of demonstrating bias against male students.")). At best, Doe's allegations "reflect bias against people accused of sexual harassment and in favor of victims and indicate nothing about gender discrimination." *Rossley*, 979 F.3d at 1195 (citing *Haley v. Va. Commonwealth Univ.*, 948 F. Supp. 573, 579 (E.D. Va. 1996)). He has not and cannot link any different treatment he received to his gender. Because Doe cannot put forth evidence generating a genuine issue of material fact for trial on the question of whether

the university expelled him *because of his sex,* his Title IX claim must be dismissed. *Rossley v. Drake Univ.*, 979 F.3d 1184, 1192 (8th Cir. 2020), *cert. denied,* 141 S. Ct. 1692 (2021).

**B.     This Court Should Grant Summary Judgment to the Defendants on Plaintiff's 42 U.S.C § 1983 Claim for Violation of His Equal Protection Rights.**

In Count II of his First Amended Complaint, Plaintiff claims that the Individual Defendants violated his right to equal protection of the law, as set forth in the Fourteenth Amendment to the U.S. Constitution, when they discriminated against him on the basis of his sex through facilitation of a biased investigation. (Am. Pet. (Document 12), at ¶¶ 47-53). Section 1 of the Fourteenth Amendment states, in part:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny any person within its jurisdiction the equal protection of the laws.

U.S. Const. Amend. XIV, § 1. Claims for violations of constitutional rights can be properly stated against government officials, in their individual capacities, who are acting under color of state law and whose actions cause a plaintiff to be subjected to a deprivation of those rights. *See* 42 U.S.C. § 1983; *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992). There is no "vicarious liability" in a § 1983 lawsuit, and "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). To establish a claim under the Equal Protection Clause, Plaintiff must "demonstrate that [he] has been treated differently by a state actor than others who are similarly situated simply because [plaintiff] belong[s] to a particular protected class." *Keevan v. Smith*, 100 F.3d 644, 647-48 (8th Cir. 1996). "Treatment of dissimilarly situated persons in a dissimilar manner by

[a state actor] does not violate the Equal Protection Clause." *Id.* "Absent a threshold showing that []he is similarly situated to those who allegedly receive favorable treatment, the plaintiff does not have a viable equal protection claim." *Id.* (internal quotation marks omitted) (quoting *Klinger v. Dep't of Corr.*, 31 F.3d 727, 731 (8th Cir. 1994)).

As outlined in Section A above, Doe claims that Complainant received favorable treatment during UI's disciplinary proceedings. However, he has not and cannot identify a proper comparator. "It goes almost without saying that . . . sexual assault complainant[s] and those [they] accuse[] of sexual assault are not similarly situated as complainants." *Regents of the Univ. of Minn.*, 999 F.3d at 581 (quoting *Haidak v. Univ. Of Mass-Amherst*, 933 F.3d 56, 74 (1st Cir. 2019)). The Complainant is not similarly situated to Doe, because no one filed a complaint against her. *See id.* The female responding party discussed in Section IV(A)(1) above is also not a proper comparator, because she was not accused of substantially similar conduct to that committed by Doe. *Doe v. Dordt University*, 616 F. Supp. 3d at 899 (citing *Doe v. Washington Univ.*, 434 F. Supp. 3d 735, 757 (E.D. Mo. 2020) (finding that the proffered comparators were not "similarly situated" because they were not accused of substantially similar policy violations)). Even if she is a proper comparator, Doe cannot demonstrate that she was treated more favorably than he was in her student disciplinary proceedings, and that the favorable treatment was because of her sex. Because Doe cannot establish that a similarly situated female responding party received favorable treatment in her student misconduct proceeding at UI, his Equal Protection claim must be dismissed on the merits. *See Keevan*, 100 F.3d at 648.

### 1. **Plaintiff's claims are barred by the doctrine of qualified immunity.**

Even if this Court determines that Doe can demonstrate that a female responding party at UI was treated more favorably than Doe during her student disciplinary

proceedings, it should still grant the Individual Defendants qualified immunity and dismiss them from this case. Under the doctrine of qualified immunity, government officials whose conduct has not "violated clearly established statutory or constitutional rights of which a reasonable person would have known" are not liable for civil damages. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Whether a legally protected interest is clearly established turns on the 'objective legal reasonableness of an official's acts.' Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate." *Burnham v. Ianni*, 119 F.3d 668, 674 (8th Cir. 1997).

Qualified immunity balances the need to hold public officials accountable for their conduct with the need to shield public servants from harassment, distraction, and liability when their conduct has been reasonable. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Government officials who meet the above criteria are protected by qualified immunity whether the alleged error in conduct is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231 (citing *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (KENNEDY, J., dissenting) (quoting *Butz v. Economou*, 438 U.S. 478, 507 (1978), for the proposition that qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law")). Further, a qualified immunity defense "may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated. Evidence concerning the defendant's subjective intent is simply irrelevant to that defense." *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998).

Lower courts were once required to engage in a rigid two-step analysis to determine whether defendants were entitled to qualified immunity—first, analyzing the

facts to decide whether a case could be made for a constitutional violation, and then determining whether, at the time of defendant's alleged misconduct, the constitutional right at issue was "clearly established." *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). However, in *Pearson v. Callahan*, the United States Supreme Court did away with the rigid framework set forth in *Saucier* and determined that requiring courts to decide difficult constitutional questions in cases in which, for example, "it is plain that a constitutional right is not clearly established, but far from obvious whether in fact there is such a right" was an unwise use of scarce judicial resources. 555 U.S. at 236–37. Under *Pearson*, the procedure set forth in *Saucier* is no longer mandatory, and district court judges are encouraged to decide which prong of the test to address first in order to make a "fair and efficient disposition of each case." *Id.* at 236–42.

      *a.*  *Plaintiff cannot show that the rights he claims were "clearly established" at the time of the events at issue in his Amended Complaint.*

Doe claims that he had a clearly established right under the Fourteenth Amendment to "equal access to a college education at the university and to enjoy the benefits and privileges afforced to students of the university free from sex discrimination by university administrators and officials." (Am. Pet. ¶ 50). Doe's claim that he has a right to be "free from sex discrimination" smacks of a "broad level of generality" that is prohibited in this type of analysis. *See Perry v. Adams*, 993 F.3d 584, 587 (8th Cir. 2021). In "establishing qualified immunity, the test must be applied at a level of specificity that approximates the actual circumstances of the case." *Id.* (citing *Engleman v. Deputy Murray*, 546 F.3d 944, 949 n. 4 (8th Cir. 2008). The dispositive question is "whether the violative nature of a particular conduct is clearly established." *Ashcroft v. al-Kidd,* 563 U.S. 731, 742 (2011) (noting that "The general proposition . . . that an unreasonable search

or seizure violates the Fourth Amendment is of little help" in making such particularized determinations). Because Doe has not identified, with particularity, the specific conduct he believes violated his right to Equal Protection of the laws, the Court should grant the Individual Defendants qualified immunity and dismiss this claim.

   *b. Plaintiff cannot show that any of the individual Defendants violated his constitutional rights.*

Moreover, even if this Court accepts Doe's generalized right to be free from sex discrimination as sufficiently tailored for a qualified immunity analysis, Plaintiff cannot show that any of the Individual Defendants actually violated his constitutional rights. This record is void of any evidence which supports Plaintiff's claims and he is unable to generate any genuine issue of material fact on this question. As a result, the Individual Defendants should be granted qualified immunity on Plaintiff's Equal Protection claim.[20] In Count II, Plaintiff claims the individual Defendants intentionally discriminated against him in violation of the equal protection clause of the Fourteenth Amendment in the following ways:

   *i. Kronstein and Gibson*

Plaintiff claims that Defendants Kronstein and Gibson knowingly discriminated against him the following ways:

- By "steering the Title IX/student misconduct investigation of the Plaintiff . . . to support their predetermined conclusion that the plaintiff, because of his sex, was guilty of the alleged misconduct";

---

[20] Defendants concede that actions for prospective injunctive relief are not barred by the doctrine of qualified immunity. *See Treleven v. Univ. of Minnesota*, 73 F.3d 816, 819 (8th Cir. 1996) (citing *Ex parte Young*, 209 U.S. 123, 155-56 (1908)). However, since Plaintiff can show no violation of his constitutional rights, his claims fail on the merits and his claims for prospective injunctive relief should also be dismissed.

- By giving preferential treatment to the female complainant because of her sex;

- By encouraging the complainant to accuse the plaintiff of misconduct;

- By mischaracterizing and changing statements of the witnesses in the investigative report;

- By making unsupported credibility findings based on sex;

- By failing to interview critical witnesses;

- By ignoring falsehoods, inconsistencies, and discrepancies in the Complainant and her witnesses' testimony;

- By making conclusions wholly unsupported by evidence;

- And by facilitating the presentation of biased or false testimony at the hearing.

(Am. Pet. ¶ 51(a)). As outlined in detail in Section A, each of these claims is unsupported in the record. None give specific information about the conduct at issue, and each is couched in sweeping language that prevents any substantive analysis. Of note, there is no evidence that Defendants Kronstein and Gibson steered the investigation to a predetermined conclusion, gave Complainant preferential treatment because of her sex, or undertook any unethical acts in editing or mischaracterizing[21] witness statements, "ignoring" inconsistences, making credibility findings, or "facilitating" the presentation of false evidence at hearing. Because Doe bears the burden to come forward with admissible evidence in support of his claims, and because he has not and cannot, the

---

[21] Additionally, Plaintiff appears to misunderstand the function of the Investigative Report. UI's process does not impose any obligation on the Adjudicator to adopt the Investigators' findings. The Adjudicator's review was *de novo* and she had discretion to decide how to use the Investigative Report.  (App. 116; App. 1499 at 1:08-5:54 (Gibson explaining that the report is offered for background on the case and the Adjudicator has discretion regarding how to utilize the report and whether to admit it into evidence), App. 292-93; *see also* App. 456 at 12(B)).

Court should grant qualified immunity to Defendants Kronstein and Gibson on his Equal Protection claim.

ii.    Uden-Holman

Plaintiff claims that Defendant Uden-Holman knowingly discriminated against him the following ways:

- By giving "complete and uncritical credence" to the flawed investigatory report;

- By "parroting" the investigative findings and conclusions.

(Am. Pet. ¶ 51(b)). Defendants are uncertain whether Plaintiff is claiming that Uden-Holman adopted the Gibson and Kronstein's Investigative Report, or whether he is claiming that she adopted Adjudicator Parks's report. Either way, Plaintiff can present no evidence that Uden-Holman's analysis of the record on appeal was "uncritical". He did not depose her or direct any discovery at her relating to her decision-making process. Further, a brief review of her appeal decision reveals that she has not "parroted" any part of either report, but rather, engaged in a thorough analysis of the record and highlighted pieces of evidence that she found particularly compelling. (App. 287-95). Because Plaintiff cannot provide any evidence which shows that Uden-Holman knowingly discriminated against him, the Court should grant qualified immunity to Defendant Uden-Holman on his Equal Protection claim.

### C.    This Court Should Grant Summary Judgment to the Defendants on Plaintiff's 42 U.S.C. § 1983 Claim for Violation of His Procedural Due Process Rights.

In Count III of his Amended Complaint, brought pursuant to 42 U.S.C. section 1983 against all Individual Defendants in their official and individual capacities, Plaintiff asserts violation of his Fourteenth Amendment right to substantive and procedural due process. (Document 12, at ¶¶ 54-61). To survive Defendants' Motion for Summary

Judgment, Doe must show that each individual Defendant, "through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

The Due Process Clause of the Fourteenth Amendment prohibits state governments from depriving any person of "life, liberty, or property, without due process of law . . ." U.S. const. amend. XIV, § 1. The Due Process Clause includes two distinct components: procedural due process and substantive due process. *See County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 1713 (1998). In analyzing either type of due process claim, the Court first evaluates the interest allegedly violated. *Dover Elevator Co. v. Arkansas State Univ.*, 64 F.3d 442, 445-46 (8th Cir. 1995). "The possession of a protected life, liberty, or property interest is . . . a condition precedent to the government's obligation to provide due process of law." *Movers Warehouse, Inc. v. City of Little Canada*, 71 F.3d 716, 718 (8th Cir. 1995). Without deprivation of life, liberty, or property, a plaintiff's label of the government's conduct as "arbitrary and capricious" is not sufficient to support a substantive due process claim. *See Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 (1985).

### 1.  Doe's Substantive Due Process Claim Fails

The substantive component of the due process clause "specially protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'" *Singleton v. Cecil*, 176 F.3d 419, 425 (8th Cir. 1999) (citing *Washington v. Glucksberg*, 521 U.S. 702 (1997)). "Substantive due process rights are created only by the Constitution," while procedural due process rights may arise under state law or the Constitution. *Ewing*, 474 U.S. at 229 (Powell, J.,

concurring). A liberty interest created under state law may be entitled to procedural due process protections, however a state-created liberty interest will never form the basis of a substantive due process claim. *Vitek v. Jones*, 445 U.S. 480, 488 (1980). As such, substantive due process protections have typically only been accorded to fundamental rights which arise under the Constitution, such as the right to marry, procreate, direct the upbringing and education of one's children, to marital privacy, to contraception, to abortion, and to bodily integrity. *Albright v. Oliver*, 510 U.S. 266, 272 (1994); *Moran v. Clarke*, 296 F3d 638, 644-45 n. 5 (8th Cir. 2002); *but see Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022) (holding that abortion is not a fundamental right protected by the U.S. Constitution).

> a. *The U.S. Constitution does not protect a fundamental right to continued enrollment at the University of Iowa.*

Doe claims that he has a "clearly-established right under the Fourteen [sic] Amendment to the Constitution to equal access to, procedurally and substantively, a college education at the university and to enjoy the benefits and privileges afforced [sic] to students of the university free from sex discrimination by university administrators and officials." (Am. Pet. ¶ 58). He claims that the individual Defendants violated that right when they: steered the outcome of the student misconduct investigation, facilitated a biased investigation, gave preferential treatment to the female complainant because of her sex, encouraged the complainant to accuse Doe of misconduct, mischaracterized and changed witness statements, made unsupported credibility findings, failed to interview certain witnesses,[22] ignored inconsistencies in testimony, and made recommendations

---

[22] During his deposition, Plaintiff claimed that UI failed to interview two witnesses that he suggested. (App. 1474-76, at 20:21-26:14).  However, the Investigators did interview

unsupported by the evidence. (*See* Am. Pet. ¶ 59).

Doe does not have a constitutionally protected fundamental right to continued enrollment at the University of Iowa as a matter of law. *See, e.g., San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35–37 (1973) (observing that "Education . . . is not among the rights afforded explicit protection under our Federal Constitution. Nor do we find any basis for saying it is implicitly so protected.").[23] Since there is no established constitutional right to continued enrollment or to higher education in general, and since Plaintiff cannot demonstrate that the presumption of any such right would give rise to a substantive due process claim, Plaintiff's substantive due process claim fails and should be dismissed.

    *b. Doe cannot demonstrate that the individual Defendants' actions "shocked the conscience" or were "deliberately indifferent" to his fundamental rights in*

---

one of the students Doe mentioned during his deposition—Witness E.  Defendant Gibson even attempted to call Witness E during the hearing, but that student did not show up. (App. 700-01). The Investigators' notes from their May 28, 2020, interview with Doe reveal that Doe believed the other witness had the same views as the rest of the roommates. (App. 35).  In their notes, Defendants Kronstein and Gibson explicitly note: "He's a friend, but he had same viewpoint as rest of roommates. (didn't seem to be requesting us to talk with him)." (*Id.*).

[23] *See also Plyer v. Doe*, 457 U.S. 202, 221 (1982) ("Public education is not a 'right' granted to individuals by the Constitution."); *Coates v. Natale*, 409 Fed. Appx. 238, 240 (11th Cir. 2010) (holding that a student's substantive due process claim failed "because she failed to identify any fundamental rights that were violated by her expulsion from" college); *Salau v. Denton*, 139 F. Supp. 3d 989, 1004-05 (W.D. Mo. 2015) (dismissing plaintiff's substantive due process for failure to establish the existence of a fundamental right to public university education); *Hill v. Bd. of Trs. of Michigan State Univ.*, 182 F. Supp. 2d 621, 627 (W.D. Mich. 2001) ("The Sixth Circuit has recognized that the right to attend public high school is not a fundamental right for purposes of substantive due process analysis. The right to a public college education and the right to receive notice prior to suspension are even less fundamental."); *Tobin v. Univ. of Maine Sys.*, 59 F. Supp. 2d 87, 90 (D. Me. 1999) ("pursuit of an education is not a fundamental right or liberty for purposes of substantive due process"); *see also Doe v. University of Nebraska*, 451 F. Supp. 3d 1062 fn. 40 (D. Neb. 2020) (summarizing the various circuits' positions on property interests in higher education, and holding that even if such a property interest were assumed, Plaintiff failed to demonstrate that a state-created property right "could give rise to a substantive due process claim.").

> *violation of the U.S. Constitution, and his substantive due process claim fails on the merits.*

Plaintiff cannot establish that any of the rights or liberties he claims are entitled to substantive due process protections. Even if this Court determines that, for the purposes of this motion, Plaintiff is entitled to an assumption that such rights and liberties exist, his substantive due process claim nevertheless fails because he cannot establish that the individual Defendants were deliberately indifferent to his protected rights. The "core of the concept [of substantive due process is] protection against arbitrary action" by the government. *Putman v. Keller*, 332 F.3d 541, 547 (8th Cir. 2003) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998)).

In order to establish his substantive due process claim, Plaintiff must show that the individual Defendants engaged in arbitrary acts against him which "shock the conscience." *Putnam*, 332 F.3d at 547-48. Plaintiff may prove arbitrary, conscience-shocking behavior in a student misconduct case by demonstrating that (1) the individual defendants exhibited deliberate indifference to his protected rights, and (2) that they had an opportunity to "consider other alternatives before choosing a course of action." *Putnam*, 332 F.3d at 548; *Truong v. Hassan*, 829 F.3d 627, 631 (8th Cir. 2016). However, "[m]ere negligence can never be conscience-shocking and cannot support a claim alleging violation of substantive due process rights." *See Hart v. City of Little Rock*, 432 F.3d 801, 805 (8th Cir. 2005). Whether the individual Defendants' behavior was conscience-shocking is an "issue of law for the judge, not a question of fact for the jury." *Truong*, 829 F.2d at 631. None of the conduct Doe alleges in support of his substantive due process claim is "conscience shocking" or deliberately indifferent to Doe's constitutional rights,

and as a result, his substantive due process claim must be dismissed. *See infra* IV(C)(c)(ii), citing Section IV(1)(B); (Am. Pet. ¶ 59(a)).

> c. *Even if the rights Doe describes are fundamental rights which should be afforded substantive due process protections, the individual Defendants are entitled to qualified immunity.*

Even if this Court determines that Doe has a constitutionally-protected fundamental right to continued enrollment at the University of Iowa, it should still grant the Individual Defendants qualified immunity and dismiss them from this lawsuit. The qualified immunity standard is outlined above, in Section IV(B)(1).

> i. *Plaintiff cannot show that the rights he claims were "clearly established" at the time of the events at issue in his Amended Complaint.*

As outlined above, Doe claims that he has a fundamental right to access a college education at the University of Iowa. (Am. Pet. ¶ 58). For the same reasons that Plaintiff cannot show that this is a fundamental right, he also cannot demonstrate that this right was a "clearly established" fundamental right entitled to substantive due process protections at the time of Defendants' alleged misconduct. *See supra*, Section IV(C)(1)(a). Because Plaintiff will be unable to show that a reasonable public official would have been on notice, pursuant to clearly established law on each claim, that taking the actions they did with relation to this case would violate Plaintiff's substantive due process rights, this Court must dismiss his claim against the individual Defendants as barred by the doctrine of qualified immunity.[24]

> ii. *Plaintiff cannot show that any of the individual Defendants violated his*

---

[24] Defendants concede, again, that actions for prospective injunctive relief are not barred by the doctrine of qualified immunity. *See Treleven v. Univ. of Minnesota*, 73 F.3d 816, 819 (8th Cir. 1996) (citing *Ex parte Young*, 209 U.S. 123, 155-56 (1908)). However, since Plaintiff can show no violation of his constitutional rights, his claims for prospective injunctive relief should also be dismissed.

*constitutional rights.*

Moreover, Plaintiff cannot show that any of the Defendants actually violated his constitutional rights. This record is devoid of any evidence which supports Plaintiff's claims and he is unable to generate any genuine issue of material fact on this question. As a result, the individual defendants should be granted qualified immunity from Plaintiff's substantive due process claim. The allegations set forth in support of Plaintiff's substantive due process claim are identical to those alleged in support of his Equal Protection claim, and they fail for the same reasons. *See supra,* Section IV(1)(B).

Because Plaintiff cannot establish 1) that the individual Defendants were deliberately indifferent to his fundamental rights which are entitled to substantive due process protections, 2) that the rights he claims were "clearly established" rights entitled to substantive due process protections under the law, or 3) that the individual Defendants actually violated his substantive due process rights, Plaintiff's substantive due process claim should be dismissed in its entirety—both on the merits and on the basis of qualified immunity.

## 2. Doe's Procedural Due Process Claim Fails

In his Amended Petition, Doe claims that UI violated his right to procedural due process. Doe does not clearly articulate the source of his "property rights to attend college and to participate in postsecondary programs and activities at the university" and this Court may dismiss his procedural due process claim on that basis alone. (*See* Am. Pet. ¶ 56). Even if this Court assumes, for the purposes of this analysis, that Doe has some sort of protected liberty or property interest in his education, Doe will be unable to demonstrate that he was denied due process of the law during his student misconduct proceedings. *See Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007).

The Eighth Circuit applies a reasonableness standard in determining whether a student has been deprived of his or her constitutional rights, and instructs that "procedural due process must be afforded [to] a [disciplined] student on the college campus 'by way of adequate notice, definite charge, and a hearing with opportunity to present one's own side of the case and with all necessary protective measures.'" *Jones v. Snead*, 431 F.2d 1115, 1117 (8th Cir. 1970) (quoting *Esteban v. Cent. Mo. State Coll.*, 415 F.2d 1077, 1089 (8thCir. 1969)). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). The "necessary protective measures" outlined in *Jones* do not include the right to a process which precisely conforms to criminal procedure. *See Jones*, 431 F.2d at 117; Esteban, 415 F.2d at 1077 ("it is not sound to draw any analogy between student discipline and criminal procedure.").

Plaintiff's procedural due process complaints are set forth in his Amended Petition as follows:

> Kronstein, Gibson and Uden-Holman, acting under color of state law and via the power and authority they possessed by reasons of their respective offices or positions with the university, with the requisite degree of knowledge or intent, discriminated against plaintiff and deprived him of his due process rights on the basis of his sex. More particularly:

> a. Kronstien and Gibson discriminated against the plaintiff by steering the Title IX/student misconduct investigation of the plaintiff, and actively facilitating a biased investigation, to support their predetermined conclusion that the plaintiff, because of his sex, was guilty of the alleged misconduct. Among other actions, because of the plaintiff's sex, these defendants did the following in violation of the plaintiff's procedural rights to a full and fair charging, investigative and adjudicatory process: gave preferential treatment and opportunities to the purported female complainant because of her sex; encourage the complainant to accuse the plaintiff of misconduct without any reasonable basis in fact; mischaracterized and changed statements of both the complainant (and her witnesses) in the investigative report and of the plaintiff (and his witnesses); made unsupported "credibility" findings or conclusions in favor of the

complainant and her witnesses based on the complainant's sex and correspondingly made adverse findings and conclusions against the plaintiff and his witnesses based on the plaintiff's sex; improperly restricted and/or failed to consider or interview critical witnesses and experts supportive of the plaintiff's version of events and on the basis of the plaintiff's sex; ignored or excused significant falsehoods, inconsistencies, and discrepancies in the complainant's (and her witnesses') testimony and on the basis of the parties' respective sex; made recommendations and conclusions of guilt and discipline that were wholly unsupported by the evidence (let alone the preponderance of the same); and provided or facilitated the presentation of biased or false testimony at the hearing.

b.  Uden-Holman discriminated against the plaintiff and on the basis of his sex to support her predetermined and biased conclusion that the plaintiff, because of his sex, was guilty of the alleged misconduct. Among other actions, because of the plaintiff's sex, this defendant did the following in violation of the plaintiff's procedural rights to a full and fair charging, investigative and adjudicatory process: gave complete and uncritical credence to the biased and improper investigatory report submitted by the university Title IX investigators without any reasonable basis in fact, which report mischaracterized and changed statements of both the complainant (and her witnesses) in the investigative report and of the plaintiff (and his witnesses), made unsupported "credibility" findings of conclusions in favor of the complainant and her witnesses based on the complainant's sex and correspondingly made adverse findings and conclusions against the plaintiff and his witnesses based on the plaintiff's sex, improperly restricted and/or failed to consider or interview critical witnesses and experts supportive of the plaintiff's version of events and on the basis of the plaintiff's sex, ignored or excused significant falsehoods, inconsistencies, and discrepancies in the complainant's (and her witnesses') testimony and on the basis of the parties' respective sex, made recommendations and conclusions of guilt and discipline that were wholly unsupported by the evidence (let alone the preponderance of the same); and on this unsubstantiated basis, simply parroted the investigative findings and conclusions as the university's final decision against the plaintiff, both substantively and on the penalty (expulsion) entry and on the basis of the plaintiff's sex.

(Am. Compl. ¶ 59). These claims are identical to those set forth in support of Doe's Equal Protection and Substantive Due Process claims. Notably, Doe's complaints are so generalized and conclusory as to deny the reader any real insight into which portions of the disciplinary process he believes lacked due process protections. Doe appears to believe that the only way that the Adjudicator and Appeal Officers could have found that he lacked

credibility is if they were sexist. This line of reasoning fails to consider the myriad of evidence cited by the Investigators, the Adjudicator, and Provost Tanya Uden-Holman in support of their thoughtful and thorough decisions. (App. 188-229; App. 287-311).

Further, this record contains overwhelming evidence that Doe received any and all process he was due throughout the student disciplinary proceeding. It is undisputed that Doe received written notice of the claims and findings against him at each stage.[25] (SOF ¶¶ 17, 22). A neutral investigator collected evidence and interviewed a variety of witnesses from both sides, and followed up with witnesses as needed. (SOF ¶ 16). Plaintiff timely received a copy of the investigator's reports, which are very thorough and contain a summary of the investigator's rationale and findings of fact. (SOF ¶22 ). Plaintiff's case proceeded to a three-day hearing before a neutral adjudicator. (SOF ¶¶ 23, 38). Plaintiff was represented by two experienced attorneys, was provided a complete set of the notes from all witness interviews which occurred during the investigation phase, and was permitted to submit both exhibits and questions to be asked of each witness at hearing. (SOF ¶¶ 27, 33). Plaintiff was permitted to testify and to call witnesses in his defense, including one expert witness. (SOF ¶¶ 35, 43). After the hearing, Plaintiff timely received a copy of the adjudicator's decision, which found that he had violated UI's policies. (SOF

---

[25] Doe did mention one perceived procedural failing during his deposition. At that time, he claimed that he was not notified when the complaint against him was first received and alleged that the delayed lack of notification was a violation of his due process rights. (App. 1486, at 66:18-67:5). However, the uncontroverted evidence in this record establishes that Doe was not immediately notified of the complaint because the Complainant was, at the time of her report, uncertain of his identity. (App. 67 (UI investigators summarizing that "there was a bit of uncertainty of the identification of the person who may be responsible for the alleged assault")). Doe did, however, ultimately receive notice of the complaint against him, of the policies implicated, the witnesses that might be called, his rights in the process, and of the time and date of the hearing shortly after the Investigators first met with Complainant. (App. 115-17).

¶¶ 47, 48). The report was thorough and contained significant detail regarding the Adjudicator's fact findings, credibility determinations, and analysis. (App. 188-229). He was then able to engage in two appeals, with the assistance of his counsel, each of which were decided against him. (SOF ¶¶ 58, 68). Plaintiff has been afforded a meaningful opportunity to be heard in this case and has not come forth with any evidence to the contrary. As a result, any remaining claim for declaratory or injunctive relief should be dismissed.

  *a.   The Court should grant the Individual Defendants qualified immunity on Doe's Procedural Due Process claim.*

Even if the Court determines that Doe has generated a genuine issue of material fact on his procedural due process claim, it should nevertheless grant the Individual Defendants qualified immunity. The qualified immunity standard is set forth above in Section IV(B). Because Doe has not identified particular violations of his procedural due process rights or come forth with evidence that any of the individual Defendants knowingly violated those rights, this Court should grant the Individual Defendants qualified immunity on Doe's procedural due process claim. (*See* Am. Pet. ¶ 59(a)-(b)).

## V.    CONCLUSION

For all the reasons set forth in their Motion for Summary Judgment and this Memorandum, Defendants respectfully request the Court grant Defendants' Motion for Summary Judgment and dismiss Plaintiff's case in its entirety.

Respectfully Submitted,

**BRENNA BIRD**
**Attorney General of Iowa**

**/s/ Kayla Burkhiser Reynolds**
KAYLA BURKHISER REYNOLDS
**/s/ Adam Kenworthy**
ADAM KENWORTHY
Assistant Attorneys General
Department of Justice
Hoover State Office Building, 2nd Floor
1305 E. Walnut Street
Des Moines, IA 50319
Ph:      (515) 725-5390/654-6562
Fax:    (515) 281-4902
kayla.burkhiser@ag.iowa.gov
adam.kenworthy@ag.iowa.gov
ATTORNEYS FOR DEFENDANTS

| PROOF OF SERVICE |
| --- |

The undersigned certifies that the foregoing instrument was served upon each of the persons identified as receiving a copy by delivery in the following manner on June 20, 2023:

☐ U.S. Mail        ☐ FAX
☐ Hand Delivery    ☐ Overnight Courier
☐ Federal Express  ☐ Other
☒ CM/ECF

Signature: _/s/ Audra Jobst_