IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| JOHN DOE,<br><br>                    Plaintiff,<br><br>        vs.<br><br>THE UNIVERSITY OF IOWA; KRISTA KRONSTEIN, individually and in her official capacity as Investigator in the Office of Student Accountability; KRISTAL GIBSON, individually and in her official capacity as Associate Director in the Office of Student Accountability; and TONYA UDEN-HOLMAN, individually and in her official capacity as Associate Provost for Undergraduate Education,<br><br>                    Defendants. | 3:22-cv-00001-SHL-SBJ<br><br><br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

John Doe was expelled from the University of Iowa after an investigation concluded he engaged in non-consensual sexual intercourse with a female student. Although Doe disagrees with the outcome of the investigation, he has not established sufficient facts to allow a reasonable juror to conclude there was a violation of his federal constitutional or statutory rights. The Court therefore GRANTS Defendants' Motion for Summary Judgment.

## I. Factual Background.

The following facts are either undisputed or, where genuinely disputed, interpreted in the light most favorable to John Doe, the non-moving party. *Smith v. Ashland, Inc.*, 250 F.3d 1167, 1171 (8th Cir. 2001). Doe was a student at the University of Iowa during the 2019–2020 academic year. (ECF 13, ¶ 11; ECF 44-1, ¶¶ 1–2.) He was expelled in January 2021 following an investigation and hearing relating to allegations that he had sexually assaulted a female student on October 31, 2019. (ECF 44-1, ¶ 49.) Doe's expulsion was upheld by both the University of Iowa's Office of the Provost and the Iowa Board of Regents. (Id., ¶¶ 58, 68.)

*A. The University of Iowa's Student Misconduct Procedures.*

The University's 2019–2020 Code of Student Life prohibits Sexual Misconduct, Dating/Domestic Violence, or Stalking Involving Students (the "Sexual Misconduct Policy"). (Id., ¶ 11; ECF 36, pp. 122–41, 162–77.) The Sexual Misconduct Policy is gender-neutral and states

that "[s]exual misconduct can be committed by a person of any gender, and it can occur between people of the same or different gender." (ECF 36, p. 163.) When a student is accused of sexual misconduct, the Policy advises the student to seek out an attorney or advisor "of his or her choosing." (Id., p. 170.)

The University's 2019–2020 Student Misconduct Procedure outlines the process for investigating and resolving alleged violations of University policies by students. (ECF 44-1, ¶ 12.) There is no difference in procedures for males or females who report, or are accused of, misconduct. (ECF 36, pp. 142–61.) When a student is accused of violating the Code of Student Life, the University assigns an internal investigator to look into the allegations. (Id., p. 144.) The investigator may impose interim measures on a student under investigation, including a no-contact order, while the investigation proceeds. (Id., pp. 145, 158.) The student may, however, ask the Director of Accountability to review and reconsider interim measures. (Id., p. 145.)

"Sanctions for non-consensual sexual intercourse will normally range from multi-semester suspension to expulsion from the university, with expulsion being the most likely sanction." (Id., p. 176; see also id., p. 159 ("Sexual assaults . . . will ordinarily result in the suspension or expulsion of the responding student . . . .").) The University's Sexual Misconduct policy defines "sexual assault" as a "continuum of conduct from forcible intercourse to nonphysical forms of pressure that compel individuals to engage in sexual activity against their will." (Id., p. 166.) It goes on to describe various actions that constitute sexual assault "when consent is not present." (Id.)

Individuals "who are incapacitated due to the influence of alcohol or other drugs" cannot give consent. (Id., p. 165.) "Such incapacitation occurs when an individual . . . is, at the time of the sexual activity, temporarily unable to understand what is happening or temporarily unable to control their own behavior." (Id.) A person violates the University's sexual misconduct policy if they "engage[] in sexual activity with a person who is incapacitated if 1) the student knew the individual was incapacitated, or 2) a reasonable person in the student's position would have a basis to know the individual was incapacitated." (Id.)

"In cases where the investigator finds it more likely than not that a policy violation occurred, determines the recommended sanction to be suspension or expulsion, and the material facts of the case are in dispute, the Director of Student Accountability will order a formal hearing and assign a charging officer and an adjudicator." (Id., p. 149.) "The charging officer's role is to coordinate the presentation of witnesses and evidence against the responding student, and urge the

adjudicator to find the responding student responsible for alleged rule violation(s)." (Id., p. 150.) An investigator may be appointed as the charging officer. (Id.) The adjudicator presides over the hearing, questions witnesses, resolves evidentiary issues, and ultimately determines whether University policy was violated. (Id.) The adjudicator must be competent, fair, and unbiased; if a party believes the adjudicator cannot satisfy these requirements, the party may submit an objection describing alleged bias or conflicts of interest to the Director of Student Accountability. (Id.)

Investigators and adjudicators apply a preponderance of the evidence standard to their review of allegations, including in a formal hearing:

> If the investigator determines that it is more likely than not that no policy violation occurred, the report will be dismissed. If the investigator or adjudicator determines that it is more likely than not that one or more University policies were violated, a sanction or sanctions will be imposed.

(Id., pp. 148, 155.) Students responding to allegations in a formal hearing may have an attorney represent them throughout the hearing. (Id., p. 153.) The attorney may call witnesses and lodge objections to witnesses, evidence, and other issues. (Id.) "Consistent with the educational nature of the Student Misconduct Procedure," the adjudicator ordinarily questions the reporting party, responding student, and witnesses, although parties to the hearing "may suggest questions to the adjudicator." (Id., p. 154.)

The adjudicator has wide latitude over the admissibility of evidence, and "formal or technical rules of evidence" do not apply:

> The adjudicator has discretion to receive and consider offered evidence, and will base a finding upon the kind of evidence which reasonably prudent persons are accustomed to rely for the conduct of their serious affairs. . . . [F]ormal or technical rules of evidence or procedure utilized in courtrooms do not apply to the hearing. The adjudicator's decision may be based upon evidence that may be inadmissible in a criminal or civil court. Irrelevant, immaterial, or unduly repetitious evidence should be excluded.

(Id., p. 155.) The Procedures provide, however, that "[w]hen a case involves two parties who engaged in sexual activity for the first time, a party's past sexual behavior with a different individual is not generally admissible." (Id.) "The prohibition includes, for instance, rumors or innuendo of one's sexual history as well as established facts." (Id.)

If the adjudicator determines a student violated the University's prohibition on sexual misconduct, the student may appeal. (Id., p. 159.) Non-appealing parties may respond to the appeal. (Id., p. 160.) Cases involving suspension or expulsion are appealed to the Office of the

Provost. (Id.) The office reviewing the appeal then issues a decision letter affirming, reversing, or remanding the prior decision. (Id., p. 161.) The reviewing office's decision "is the final institutional action on the matter" and any further appeal must be made the Iowa Board of Regents. (Id.)

B. *Sexual Assault Allegations Against Doe and Subsequent Investigation.*

On December 23, 2019, a University of Iowa female undergraduate student (the "Reporting Party") reported to the University's Sexual Misconduct Response and Title IX Coordinator that she was sexually assaulted following a Halloween party on October 31, 2019. (ECF 44-1, ¶¶ 7, 9, 13.) The University's Director of Student Accountability, Angela Ibrahim-Olin, assigned Defendant Krista Kronstein, a Title IX and Gender Equity Investigator, and Defendant Kristal Gibson, a Title IX Associate Director, to investigate the matter. (Id., ¶¶ 3–4, 8, 14.) Kronstein led the investigation. (Id., ¶ 14.)

Kronstein and Gibson met with the Reporting Party on January 14, 2020, and began interviewing witnesses the following month. (Id., ¶¶ 15–16.) The Reporting Party initially was not able to identify the student who allegedly assaulted her. (ECF 34, p. 72.) After interviewing several witnesses, however, the investigators "were certain of the identity of [Doe]" as the subject of the allegations. (Id.) Kronstein sent Doe a Notice of Complaint and Investigation on February 24, 2020, informing him of the allegations and investigation. (ECF 44-1, ¶ 17.) The Notice also imposed a no-contact order between him and the Reporting Party but indicated that he could request reconsideration of the order. (Id., ¶¶ 18–19.)

On September 14, 2020, Kronstein and Gibson submitted a report detailing their investigation and findings to Ibrahim-Olin. (Id., ¶ 20.) The report contained, *inter alia*, a credibility analysis and findings of fact. (ECF 34, pp. 94–97.) Kronstein and Gibson made their findings of fact by a preponderance of evidence. (Id., p. 95.) They found the Reporting Party had begun drinking alcohol at home on the night of October 31, 2019, and continued drinking at a party where she met Doe. (Id.) She also took one or two "dabs" of marijuana from a vaporizer. (Id.) The Reporting Party then began speaking with a man later identified as Doe. (Id.) The Reporting Party was feeling the effects of the alcohol and marijuana during the conversation and had difficulty holding onto her phone and drink and understanding what was going on. (Id., pp. 95–96.)

Doe invited the Reporting Party to his apartment across the hall to watch television. (Id., p. 96.) Doe had to steady herself on the walls while walking to the apartment. (Id.) Doe led the Reporting Party to his bedroom, where Doe and the Reporting party sat on his bed. (Id.) Doe then

informed the Reporting Party that the television was broken. (Id.) They kissed. (Id.) The Reporting Party had to steady herself on Doe's shoulders and it took her "some time to realize that she was being kissed." (Id.) Doe took off his clothes and the Reporting Party's clothes and engaged in vaginal intercourse with her. (Id.) He did not ask for her consent to do so. (Id.) During the encounter, the Reporting Party asked Doe for his Snapchat on two occasions. (Id.) She also told Doe she should go find her friend. (Id.) Doe ejaculated, and the Reporting Party went to the bathroom. (Id.)

After the encounter ended, one of Doe's roommates knocked on the bedroom door and told him people were looking for the Reporting Party. (Id.) The Reporting Party's roommate then knocked on Doe's bedroom door and opened it, finding the Reporting Party sitting on Doe's bed. (Id.) The Reporting Party quickly dressed and left the room. (Id.) Doe similarly left and saw the Reporting Party's boyfriend, who he did not recognize, in the kitchen. (Id.) The Reporting Party "had a difficult time walking" and "stumbled" into her boyfriend's arms. (Id.)  The Reporting Party's boyfriend "[held] her up as they exited the building." (Id., p. 97.) Doe returned to his room. (Id., p. 96.)

Once outside, the Reporting Party threw up. (Id., p. 97.) The Reporting Party and her boyfriend sat down on the apartment building steps and the Reporting Party fell backwards, her boyfriend catching her to prevent her head from hitting the steps. (Id.) The Reporting Party's boyfriend needed assistance to bring her to his car, where the Reporting Party threw up again. (Id.) On the drive to her apartment, the Reporting Party "kept repeating that she wanted to die." (Id.) At her apartment, the Reporting Party threw up again and continued crying. (Id.) In the morning, the Reporting Party "agreed to go to the hospital because she was still feeling sick." (Id.) A Sexual Assault Nurse Examiner performed a sexual assault exam on the Reporting Party. (Id.)

In the credibility analysis supporting their findings of fact, Kronstein and Gibson found Doe's witnesses were not credible, but the Reporting Party's witnesses were credible:

> At first glance, Responding Party's [Doe's] roommates, four of the thirteen witnesses, seemed to be corroborating witnesses to his account. However, when grouped together, their accounts indicated a clear bias for the responding party's version of events. The roommates' accounts were so similar that they appeared to be rehearsed. That was particularly true when they described Reporting Party's condition when walking out of Responding Party's individual bedroom, saying she seemed "fine" and "normal" until she saw the person they assumed was her boyfriend. They each had differing views down the hallway based on their accounts, so it is of note that they were able to describe her in nearly the same way

with very similar descriptions. It is also notable that they shared their discussion that they were concerned that the male visitor to their apartment was Reporting Party's boyfriend, but even when asked about any other statements, none of them acknowledged the exclamation that "he had just f***ed her" that was overheard by Witness B and Witness H. It was also notable that Witness M, who was among the earliest witnesses we spoke with, failed to mention when describing his actions that night that he had a female guest in his room at the time.

Reporting Party provided us with several witnesses. None of the witnesses provided were present during the alleged assault and were quick to share that fact with Investigators. Each had varied perspectives that provided information that was helpful for Investigators in understanding what happened prior to, just after, and in the days, weeks, and months following the alleged assault. Witness B, Witness H, and Witness D described in specific detail their observations of Reporting Party's physical state in the moments after she left Responding Party's apartment and the length of time she was impacted, leading to her trip to the hospital the next morning. Their observations corroborated each other. These witnesses were deemed credible. Witness I provided electronic copies that confirmed her sleuthing conclusions.

(Id., pp. 94–95.)

Two of the witnesses Kronstein and Gibson interviewed, Witnesses "E" and "I," made statements that Doe interprets as reflecting uncertainty about the Reporting Party's level of incapacitation. Witness E, for instance, made the following statements:

- I didn't really realize how much [Reporting Party] had to drink because [Witness I] had a lot to drink and I was kind of taking care of her.

- [Witness I] had to take a break, and that's when I lost [the Reporting Party].

- I didn't know how drunk [the Reporting Party] was. She is hard to read about how drunk she is, so I didn't know where she was at.

- I didn't see [the Reporting Party] spill anything or run in to anyone. She doesn't really get rambunctious, she wasn't making a scene.

- I think [the Reporting Party] mentioned to me that [she] had a couple of hits of a pen – dabs.

(Id., pp. 18–19; ECF 45-1, ¶ 14.) For her part, Witness I stated:

- [The Reporting Party] and I drank quite a bit before we went to the first party, a frat party, and we decided to go to the other party after the frat party.

- I was on my way to play beer pong, and someone handed me their dab pen.

- I took a hit and I was completely gone after that.

- I don't think [the Reporting Party] took a hit from the same pen. I think she had taken hits before we even got to the party.

- I passed out on the couch after I had taken a hit.

- I was in and out of it. I remember people huddled around me at the party.

- My theory is that when everyone was huddled around me, Doe took [the Reporting Party] across the hall.

- I kept asking [the Reporting Party] if she was "good" and she kept saying she was okay. I was pretty drunk, too.

(ECF 34, p. 24; ECF 45-1, ¶ 15.)

Kronstein and Gibson concluded the Reporting Party was incapacitated at the time of her interactions with Doe, and Doe should have known she was incapacitated:

> There is a preponderance of evidence to conclude that Reporting Party had consumed alcohol and marijuana to the point of incapacity and was unable to consent to sexual activity. We also find that it is more likely than not that Responding Party should have known that Reporting Party was incapacitated and unable to give consent to their sexual activity based upon the information observable to him at the time.

(ECF 34, p. 100.) Kronstein and Gibson determined there was "no indication that [Doe] was told, by others or Reporting Party herself, that she was intoxicated to the point of incapacity" and so it could not be proven that Doe "in fact, knew of her capacity" in the sense of being told about it. (Id., p. 99.) Rather, Doe should have known of the Reporting Party's incapacity based on "'context clues' that [he], or any reasonable person, would have had available to determine Reporting Party's level of capacity . . . ." (Id., p. 100.) These clues included Doe knowing alcohol was being served at the party; his seeing the Reporting Party consuming alcohol; and the Reporting Party's behavior, including her difficulty standing upright and holding onto her phone and drink, laughing at odd times, following him "very closely" to his apartment, and her unusual request in the middle of sex that he communicate with her on Snapchat. (Id.)

Kronstein and Gibson ultimately concluded Doe had violated University prohibitions on sexual assault and assaultive behavior. (ECF 44-1, ¶ 20.) They recommended the University suspend Doe and that the case proceed to a formal hearing. (Id., ¶¶ 20–21.) A notice of the findings was sent to Doe and the Reporting Party the same day. (Id., ¶ 22.)

### C. Hearing and Adjudication.

Ibrahim-Olin assigned Kristin Parks (formerly Kristin Newark) to be the adjudicator for Doe's case. (Id., ¶¶ 6, 8, 23.) She assigned Gibson to act as the charging officer. (Id., ¶¶ 4, 25.) Ibrahim-Olin sent Doe and the Reporting Party a letter setting out tentative hearing dates and describing hearing procedures. (Id., ¶¶ 23–24.)

Doe and his attorneys Trevor Hook and William Kutmus attended pretrial conferences on October 7 and 26, 2020. (Id., ¶¶ 26–27.) The University and Doe submitted witness and exhibit lists and questions for Parks to ask witnesses. (Id., ¶¶ 29, 31, 36–37.) Following a final pretrial conference, Parks emailed the parties a summary of the conference. (Id., ¶ 32; ECF 34, p. 128.) The email noted, *inter alia*, that expert witness testimony from a witness proffered by Doe would be allowed despite the University's objection:

> At this time, the expert witness testimony will be allowed. The University's objection to such a witness is noted for the record. [Doe's] attorneys will provide (and have by the time I'm writing this) the expert's C.V. . . . A decision in regards to character witnesses will be made at the hearing.

(ECF 34, p. 128.)

A three-day virtual hearing was held from November 9–11, 2020. (ECF 44-1, ¶ 38.) The hearing was video-recorded and transcribed. (Id., ¶ 39.) Thirteen witnesses testified, including Doe's expert witness, Dr. Donner Dewdney. (Id., ¶ 40.) Doe was represented by counsel throughout the hearing, and his attorneys argued and objected on his behalf. (ECF 44-1, ¶ 42.) Both sides submitted additional questions for witnesses during the hearings and presented closing arguments at the conclusion of testimony. (Id., ¶¶ 44, 46.)

During the hearing, Dr. Dewdney testified at length regarding the Reporting Party's incapacitation. (ECF 37, pp. 886–87, 892–905, 909–16, 923–25.) He agreed he had not interviewed any of the students involved or provided them with care or treatment. (Id., pp. 886, 918.) His opinions were based solely on his review of Kronstein and Gibson's September 14, 2020 report on their investigation and the report from the Sexual Assault Nurse Examiner ("SANE"). (Id., pp. 880–83.) He agreed that he was "not very familiar" with SANE reports. (Id., p. 884.)

Dr. Dewdney opined that the Reporting Party "was not incapacitated and could form intent." (Id., p. 903.) He stated the "more important" reasons for his opinion were: (1) the Reporting Party's statement to a nurse that "I guess I let [Doe] do his thing" during the sexual encounter; (2) the Reporting Party's use of Snapchat on the night of the assault; (3) "the behavior observed by various witnesses;" and (4) "the absence of any lab results . . . for drugs, alcohol, or semen." (Id.) Dr. Dewdney stated that the lack of lab results showing "[s]emen was extremely important . . . ." (Id.) He believed the lack of lab results was "a tell":

> [PARKS].    But you called it a tell. What is -- Why are you calling this a tell, and how has that impacted your opinion in this case?

> A.        It's a tell for me because it seems to me it's in the reporting party's interest to verify with laboratory data that indeed she consumed alcohol and marijuana the night before to the extent that those would easily show up in subsequent lab reports.

(Id., p. 885.)

Dr. Dewdney also testified to his belief that Kronstein and Gibson's investigation suffered from confirmation bias:

> [PARKS].   And did you make a conclusion in this case as to whether or not the investigators for the University of Iowa suffered from confirmation bias?
>
> A.        Yes, I did.
>
> Q.        And what was your conclusion?
>
> A.        My conclusion was that they were biased and that they -- that they were biased in their report.
>
> Q.        What was the evidence of that?
>
> A.        One of my concerns was their description of witnesses. In one instance the witnesses for the [responding] party were described as lying because their stories were similar, and yet paradoxically they were the only actual witnesses to the events.

(Id., pp. 905–06.)

At one point, Dr. Dewdney began to opine that the Reporting Party had a "possible personality disorder," but Parks sustained the University's objection to this line of testimony:

> A.        [The Reporting Party's self-harm behaviors prior to October 31, 2019] begin[] to build a portrait of somebody who has a possible personality disorder in addition to her problems with anxiety and depression. . . .
>
> GIBSON.   I think this is going a bit too far, and I'm very uncomfortable with this. The purpose of this hearing is -- This is not appropriate to ask a reporting party to have to listen to this, so we need to stop this line of questioning is my belief or maybe see how much further this is going, but I don't think that it's appropriate for a psychiatrist who has never seen her to go outside the bounds of discussing the exact events that is the purpose here and to make a diagnosis of her entire personality. That is inappropriate and beyond the -- what he should be doing in this hearing, and she should not have to listen to this. . . .
>
> PARKS.    I don't believe that this line of questioning does go any further.

(Id., pp. 908–09.) Notably, Dr. Dewdney stated he had formed this opinion of a "possible personality disorder" after he learned "word of mouth" from Doe's attorney that the Reporting

Party "had exhibited . . . cutting behaviors prior to Halloween of 2019." (Id., pp. 907–08.) Dr. Dewdney agreed evidence of "cutting behaviors" was not contained in any of the reports he had reviewed, and he did not have any more details about the behavior. (Id.)

Doe's attorney complained that Dr. Dewdney should have been permitted to further "narrate" the significance of the Reporting Party's "cutting":

| | |
|---|---|
| KUTMUS. | He's going to narrate on why cutting -- Aren't you going to narrate on why cutting -- |
| PARKS. | He already did. |
| KUTMUS. | Well, he didn't narrate. He didn't explain it. Would you ask him to explain the significance of cutting? What does that mean to him? |
| PARKS. | Mr. Kutmus, I did ask that. He did answer that. And that elicited the response from Miss Gibson. So it is time to move on. |

(Id., p. 909.) After this exchange, Dr. Dewdney continued to opine on incapacitation, including on the topic of "sudden incapacitation" and the significance, or lack of significance, of the Reporting Party's recollections. (Id., pp. 909–16.)

At the conclusion of Dr. Dewdney's testimony, Doe's attorney stated on two separate occasions that he had "no further questions" for Dr. Dewdney. (Id., pp. 924, 926.) Doe's attorney also stipulated that the lack of lab results was not Reporting Party's fault:

| | |
|---|---|
| GIBSON. | Well, a lot has been made over this -- the nontesting of the samples . . . . |
| KUTMUS. | It's not important. Our expert made his opinion regardless . . . . Even if they were positive, still that doesn't mean someone is incapacitated. Under the influence, of course. No, I don't think it's important. . . . |
| PARKS. | Can we just start with a statement from an officer explaining [that samples are not tested unless there's a criminal investigation] and then see whether or not we would need to ask further questions? Maybe we could all just agree to put that in the record. |
| GIBSON. | So a statement that's from the . . . Iowa City Police Department explaining that they don't send lab reports off for analysis unless there's a criminal investigation? |
| PARKS. | Somebody along the line is insinuating it may be due to a choice based on people involved in this proceeding. |
| KUTMUS. | I will stipulate what Miss Gibson. I'll stipulate. . . . We would stipulate. |

PARKS.  So we're stipulating that there is evidence that has not been submitted to the lab and that's in no way the fault of [the Reporting Party] or a choice of [the Reporting Party].

KUTMUS.  Correct.

(Id., pp. 926–28.)

Park issued her decision on January 5, 2021. (ECF 44-1, ¶ 47.) The decision included detailed findings of fact that Parks found "to be proven by a preponderance of the evidence." (ECF 35, pp. 60–65.) The findings are more detailed than those contained in Kronstein and Gibson's September 14, 2020 report. The findings include, for instance, descriptions of what other witnesses were doing during the sexual encounter, details of Doe's and the Reporting Party's conversation prior to the encounter, and the Reporting Party's physical demeanor during the night. (Id.)

Parks also made credibility assessments for each witness other than Dr. Dewdney. (Id., pp. 66–85.) Unlike Kronstein and Gibson, she found at least one of Doe's witnesses to be "somewhat credible," although she noted each of Doe's witnesses testified in ways that was "not consistent with other more credible testimony." (Id., pp. 76–83.) There were three witnesses whose interview notes were considered in lieu of live testimony "[d]ue to time constraints and witness unavailability/unwillingness to attend." (Id. p. 90.) Two of these witnesses only would have testified as to how the Reporting Party was able to identify Doe as the alleged assailant in the weeks or months after the sexual encounter, which appears not to have been in dispute. (Id., pp. 90–91.) The third witness's testimony related to the Reporting Party's roommates' search for the Reporting Party and the Reporting Party's incapacitation. (Id., p. 91.) "All of these witnesses were given the benefit of the doubt and deemed credible." (Id., p. 90.)

Finally, Parks "analyzed [Dr. Dewdney's] testimony step by step and did not find Dr. Dewdney's testimony to be compelling." (Id., p. 88.) She noted that Doe's attorneys had provided Dr. Dewdney with only limited information, whereas Parks "was able to obtain a much larger picture of the events that happened that night and of the students involved." (Id.) Parks proceeded to address the facts supporting Dr. Dewdney's conclusion that the Reporting Party was not incapacitated and why she did not believe they supported his conclusions:

After a full analysis of this evidence, the undersigned concludes it establishes Responding Party either knew or should have known of Reporting Party's incapacity. According to Responding Party, he was engaged in a great conversation with Reporting Party. They mutually agreed to go to his apartment so they could talk some more in a quieter place. But, once they left the Halloween Party, there

was no further conversation. While walking down the hallway, not only were they not talking, but they were not even walking side by side. He was leading and she was following. A preponderance of the evidence suggests, Responding Party or a reasonable person, would have noticed that Reporting Party was not walking in a straight line. They also, would have noticed that she was dragging her hand along the wall. At the very least, these movements would have caused some sort of noise to alert Responding Party or a reasonable person to Reporting Party's current state. Upon entering Responding Party's apartment and ultimately his bedroom, a preponderance of the evidence suggests Responding Party or a reasonable person would have noticed that Reporting Party was no longer engaging in a nice conversation and was only capable of giving one-word responses. During the actual intercourse, when Reporting Party is asking Responding Party to snapchat him, a preponderance of the evidence suggests Responding Party knew or a reasonable person would have known in that moment that Reporting Party was unable to understand what was going on.

(Id., p. 96.) Parks concluded Doe violated University prohibitions on sexual misconduct. (Id., p. 97.) Ibrahim-Olin issued sanctions on January 5, 2021, expelling Doe from the University effective immediately. (ECF 44-1, ¶ 49.)

> D. *Doe's Appeal to the Office of the Provost and the Board of Regents.*

Doe appealed Parks's decision on January 22, 2021. (Id., ¶ 51.) The Reporting Party did not submit a response. (Id., ¶ 52.) Doe argued Parks's decision was not supported by substantial evidence, materially affected by procedural error, and misapplied the rules. (ECF 35, pp. 109–49.) The Provost designated Defendant Tanya Uden-Holman, Associate Provost for Undergraduate Education, to consider Doe's appeal. (ECF 44-1, ¶¶ 53–54; ECF 35, p. 157.) Uden-Holman

considered the entire record provided to [her] by the Office of Student Accountability, including but not limited to: recordings from the Zoom hearing, hearing exhibits, the adjudicator's written decision, investigators' notes from witness interviews, [Doe's] written statement, dated April 29, 2020, the investigation report and attachments, post-hearing written submissions from the parties, your written appeal, and relevant University policies and procedures.

(ECF 35, p. 160.) On February 25, 2021, Uden-Holman affirmed Parks's decision, concluding it was procedurally proper and that "[t]he preponderance of the evidence shows that [Doe] engaged in sexual activity, including penile penetration, with the Reporting Party while she was incapacitated and unable to give consent. . . . [A] reasonable person in [Doe's] position would have a basis to know that the Reporting Party was incapacitated." (Id., pp. 160–64; ECF 44-1, ¶ 58.)

Uden-Holman found, *inter alia*, that Doe's testimony lacked credibility, primarily because "[t]he reasons [he] gave for inviting the Reporting Party to [his] apartment were inconsistent and

changed over time." (ECF 35, p. 160.) She found "no error in the weight given to Dr. Dewdney's testimony," noting his lack of familiarity with Title IX cases, sexual assault, SANE reports, the record generally, and the Reporting Party:

> Dr. Dewdney has provided expert testimony in the past for criminal and civil cases, including several sexual abuse cases, usually involving minors. He testified that he served as an expert witness in several assault cases; however, those assault cases involved bullying in the high school setting. He has not previously testified in a Title IX student misconduct hearing. Dr. Dewdney testified that he has no training on common survival behaviors of victims of sexual assault. He further is "not very familiar" with SANE reports. Being an expert on the sexual abuse of minors and high school bullying does not make one an expert on sexual assault.
>
> Dr. Dewdney testified that [Doe's] attorneys provided him with University exhibits "C" (investigation report and attachments) and "F" (SANE report) to review and prepare for his hearing testimony. There is some question as to whether [Doe's] attorneys provided him with additional information but, in any event, the record is clear that Dr. Dewdney reached his conclusion that the Reporting Party was mentally troubled due to conversion disorder based on very limited information and no first-hand professional examination or interaction with the Reporting Party. Additionally, Dr. Dewdney was not provided with the University's policies or procedures. As a result, he testified regarding what incapacitation means to him, and not based on the definition of incapacitation set forth in the University's Sexual Misconduct Policy.

(Id., pp. 162–63.)

Uden-Holman further concluded that Parks properly applied 2019–2020 University policies because the conduct at issued occurred in 2019. (Id. p. 163.) Uden-Holman emphasized that Doe actively participated in the University's investigation and hearing and was represented by counsel throughout. (Id.) She also concluded Parks did not err in stopping Dr. Dewdney from "extrapolating his general knowledge about certain disorders to *this* Reporting Party, whom he has never met or professionally examined, and [properly denied] an 'offer of proof' for which there is no procedure in this administrative process." (Id., pp. 163–64.) Uden-Holman found it "important" that Doe and his attorney both confirmed they did not have "any other concerns about any witnesses or evidence" at the conclusion of the hearing. (Id., p. 164.)

Doe appealed Uden-Holman's decision on March 5, 2021. (ECF 44-1, ¶ 60.) Doe and the University both submitted written briefs. (Id., ¶¶ 61–67.) The Board of Regents "considered the appeal" and "voted to affirm the final institutional decision of the University of Iowa in its entirety (9 in favor, 0 opposed)." (Id., ¶ 68; ECF 36, p. 121.)

*E.  Doe's Lawsuit and Defendants' Motion for Summary Judgment.*

Doe filed this lawsuit on January 4, 2022, later amending his complaint. (ECF 1; ECF 12.) He accused the University of discriminating against him on the basis of sex in violation of Title IX (Count I). (ECF 12.) He also accused Kronstein, Gibson, and Uden-Holman of violating his constitutional rights to equal protection (Count II) and due process (Count III). (Id.) Defendants moved for summary judgment on all claims. (ECF 30.) Doe's Resistance addressed Defendants' Title IX and due process arguments but not their equal protection arguments. (ECF 44-3.) Doe argues there are material fact disputes regarding: (1) whether the evidence supported the finding that the Reporting Party was incapacitated and Doe knew of her incapacitation; (2) the Defendants' credibility findings; and (3) Defendants' treatment of his expert witness's testimony. (Id., pp. 7–10.) The Court held a hearing on August 3, 2023. (ECF 48.)

## II. Legal Analysis.

*A.  Summary Judgment Standard.*

Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Smith*, 250 F.3d at 1171. "A fact is material if it 'might affect the outcome of the suit.'" *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248).

*B.  The Court Grants Summary Judgment on Doe's Title IX Claims.*

"No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "To state a claim, therefore, Doe must allege adequately that the University disciplined him on the basis of sex—that is, because he is a male. *Doe v. Univ. of Ark. - Fayetteville*, 974 F.3d 858, 864 (8th Cir. 2020). "A decision that is against the substantial weight of the evidence and inconsistent with ordinary practice on sanctions may give rise to an inference of bias, although not necessarily bias based on sex." *Id*. at 865. "To survive summary judgment . . . [a plaintiff is] required to set forth sufficient evidence to

allow a reasonable jury to find that [the University of Iowa] disciplined him on the basis of sex." *Rossley v. Drake Univ.*, 979 F.3d 1184, 1192 (8th Cir. 2020).

"The use of biased perspectives or stereotypes in Title IX proceedings is sufficient for a reasonable jury to infer discrimination on the basis of sex." *Moe v. Grinnell Coll.*, 556 F. Supp. 3d 916, 932 (S.D. Iowa 2021). Plaintiffs also may establish a triable case by producing evidence that "support[s] an inference that the University discriminated against [them] on the basis of sex." *Univ. of Ark. - Fayetteville*, 974 F.3d at 864. These circumstances might include "external pressure from public attention and the threatened loss of federal funding" and "an outcome that was against the substantial weight of the evidence . . . [and] deviat[ed] from ordinary sanctions." *Does 1-2 v. Regents of the Univ. of Minn.*, 999 F.3d 571, 578 (8th Cir. 2021); *Univ. of Ark. - Fayetteville*, 974 F.3d at 864–65.

Finally, district courts have also permitted plaintiffs to establish Title IX violations under an "erroneous-outcome theory." *Doe v. Dordt Univ.*, 616 F. Supp. 3d 872, 893 (N.D. Iowa 2022). This requires a plaintiff to show "evidence illustrating an articulable doubt as to the accuracy of proceeding's outcome" and "particular circumstances showing gender bias was a motivating factor in the erroneous outcome." *Id.*; *but see Rossley*, 979 F.3d at 1192 (casting doubt on continued viability of erroneous outcome theory in light of *University of Ark. – Fayetteville*). It is not enough for a plaintiff to make "generalized" allegations that a "University's attitude about Title IX investigations 'clearly leads to gender bias against males.'" *Mulla v. Univ. of Minn.*, No. 20-CV-931 (SRN/LIB), 2021 WL 603774, at *10 (D. Minn. Feb. 16, 2021), *aff'd*, No. 21-1693, 2022 WL 570099 (8th Cir. Feb. 25, 2022). Similarly, "a victim-centered approach does not create an inference of gender bias without evidence of gender bias in its formulation or application." *Rossley v. Drake Univ.*, 342 F. Supp. 3d 904, 928 (S.D. Iowa 2018), *aff'd*, 979 F.3d 1184 (8th Cir. 2020).

Doe does not claim the investigators or adjudicator were overtly biased or relied on biased stereotypes. Nor does he allege the University was under any external pressure to conclude he had committed sexual assault. Rather, he argues summary judgment is inappropriate because the investigators and adjudicator reached an "erroneous outcome" and thus there is a "plausible inference" of discrimination. (ECF 44-3, p. 10.) Doe lodges four complaints in particular: (1) there was "substantial evidence" that the Reporting Party "was not incapacitated" and that Doe "should not have known [of her incapacitation] through . . . 'context clues'"; (2) "the investigators summarily determined credibility of the two respective sides"; (3) "the [Reporting Party's]

purported 'incapacitation' was not even a subject agreed upon by her own witnesses"; and (4) Doe's expert was "summarily not considered, and even cut-short . . . ." (Id., pp. 7–10.)

Doe's arguments are inconsistent with the record. There was significant evidence of incapacitation and that a "reasonable person" in Doe's position would have known it. The Reporting Party was openly consuming alcohol, struggling to stand upright and hold her phone and drink, and laughing at odd times. She had difficulty walking in a straight line to Doe's room, was dragging her hand along the hallway wall, and stopped engaging in what had been, according to Doe, "a great conversation." By the time they reached Doe's apartment, the Reporting Party "was only capable of giving one-word responses." Evidence from after their sexual encounter likewise shows incapacitation: the Reporting Party "had a difficult time walking," had to be held up as she left the building, and threw up repeatedly once they were outside. The Eighth Circuit has affirmed a finding of incapacitation in lesser circumstances. *See Rossley*, 979 F.3d at 1193 (holding evidence supported finding female student was incapacitated despite her being "able to converse, to send text messages . . . , and to return safely to her apartment").

The Court rejects Doe's implication that the University's policies are vague because they did not put him on notice of the "context clues" he was supposed to evaluate to know if the Reporting Party was incapacitated. The concept of "context clues" is not arbitrary or idiosyncratic; rather, students are expected, before engaging in sexual contact, to consider things like how much the other person has had to drink and how that person is acting and communicating. This is consistent with the prohibition in the University's Sexual Misconduct policy on engaging in sexual activity if a "reasonable person in the student's position would have a basis to know the individual was incapacitated" (ECF 36, p. 165), which gives sufficient notice of the prohibited conduct. *See Rowles v. Curators of Univ. of Mo.*, 983 F.3d 345, 356 (8th Cir. 2020) (affirming use of "objective" and "reasonable person" standard in university policy, as disciplinary rules require less specificity than criminal statutes).

The investigators and adjudicator also did not "summarily determine[] credibility of the two respective sides." (ECF 44-3, p. 8.) Kronstein and Gibson included extensive witness interview notes with their report and carefully explained why they reached their credibility conclusions. They discounted the testimony of Doe's roommates because their "accounts were so similar that they appeared to be rehearsed" and "describe[d] [Reporting Party] in nearly the same way with very similar descriptions" despite having "differing views down the hallway" to Doe's

bedroom. In addition, Kronstein and Gibson found it significant that none of Doe's witnesses admitted to making or hearing the crude comment—"he [] just f***ed her"—reportedly heard by two of the Reporting Party's witnesses when the Reporting Party's boyfriend entered Doe's apartment. The Reporting Party's witnesses would have had no reason to lie about hearing this comment, which does not, in and of itself, speak to the Reporting Party's capacity to engage in consensual sexual conduct. Yet Doe's roommates refused to admit hearing or making the comment. This suggests they were not trying to tell the truth about what happened that night, but rather were intent on defending against all suggestions of impropriety, large or small. By contrast, the Reporting Party's witnesses offered "varied perspectives" on what happened and the Reporting Party's level of incapacitation, which is what one would expect from witnesses who encountered the Reporting Party at different times and in different contexts.

For her part, Parks analyzed credibility in even more detail than Kronstein and Gibson, with whom she partially disagreed as the credibility of one of Doe's roommates, whom Parks found somewhat credible. In these circumstances, Doe is misstating the record when he claims the credibility determinations were "blanketly adopted all the way up the . . . decision-making chain" or that the University decided "right-up-front" that Doe's roommates were not credible. (ECF 44-3, pp. 8–9.) The record shows instead that each of Parks, Kronstein, and Gibson engaged in a careful and nuanced credibility analysis. On appeal, Uden-Holman took a similar approach, including finding that Doe's testimony lacked credibility because it was "inconsistent and changed over time." Determining witness credibility is not an exact science, and different finders of fact may attach significance to different things. There is nothing in this record that would allow a reasonable juror to conclude Defendants violated Doe's statutory or constitutional rights in how they approached witness credibility. *See Rossley*, 979 F.3d at 1193 (holding investigator's "finding that Rossley's roommate lacked credibility" did not demonstrate gender bias).

The testimony of the Reporting Party's witnesses does not, in any event, materially conflict with the conclusion that the Reporting Party was incapacitated. Doe cherry-picks two witness statements to suggest that even the Reporting Party's witnesses did not believe she was showing objective signs of intoxication:

- Witness E: "I didn't see her spill anything or run into anyone. She doesn't really get rambunctious, she wasn't making a scene."

- Witness I: "I kept asking her if she was 'good' and she kept saying she was okay."

(Id., pp. 9–10; ECF 45-1, ¶¶ 14–15.) In context, however, these statements do not undermine the conclusion that the Reporting Party was incapacitated. Witnesses E and I both said the Reporting Party was drinking "quite a bit" and using marijuana. Moreover, the mere fact that Witness I felt it necessary to ask if the Reporting Party was "good" shows that Witness I had concerns about how much she was drinking. Finally, Witnesses I said she herself had been drinking and smoking marijuana to the point of passing out, while Witness E was distracted by "taking care of" other people, thus limiting both of their abilities to speak definitively to the level of Reporting Party's incapacitation by the time of her sexual encounter with Doe. In context, then, Defendants did not violate Title IX by refusing to take isolated statements from Witnesses E and I out of context. Instead, they properly considered those statements in light of other evidence demonstrating incapacitation, including, especially, evidence regarding the Reporting Party's conduct immediately before, during, and after the sexual encounter. Indeed, notwithstanding the cherry-picked testimony of Witnesses E and I cited above, the Reporting Party's friends as a whole obviously had serious concerns about her level of intoxication given that they began searching the area after she went missing, finding her, unexpectedly, in Doe's bedroom.

Finally, Parks and Uden-Holman did not violate Title IX in their handling of Dr. Dewdney. Parks permitted Dewdney to testify over the objection of Kronstein and Gibson and only cut him off when he began to opine that the Reporting Party, whom he had never met, had a "possible personality disorder" based on "word of mouth" reports from Doe's counsel that she may have engaged in acts of self-harm on occasions separate from the night in question. It was more than permissible for Parks to limit Dr. Dewdney's testimony in these circumstances. Moreover, and more generally, Parks did not violate Title IX when she found Dr. Dewdney's testimony unpersuasive and inconsistent with the record as a whole.

In affirming Parks's decision, Uden-Holman accurately noted, *inter alia*, that Dr. Dewdney had little familiarity with Title IX issues, lacked sexual assault training, and had not reviewed University policies. Uden-Holman therefore appropriately concluded that Dr. Dewdney's opinion regarding the Reporting Party's incapacitation was "not based on the definition of incapacitation set forth in the University's Sexual Misconduct Policy." Moreover, Doe's attorneys stipulated that the lack of lab results regarding controlled substances in the Reporting Party's system was the result of Iowa City Police Department policy, not a choice made by the Reporting Party. Given

that Dr. Dewdney relied substantially on the absence of lab results to support his opinion on incapacitation, Uden-Holman did not err in finding his opinion uncompelling.

In sum, Doe has failed to show "evidence illustrating an articulable doubt as to the accuracy of proceeding's outcome." *Dordt Univ.*, 616 F. Supp. 3d at 893. At most, he is simply re-hashing reasons why the University could have reached a different conclusion than it did. Moreover, even if he had shown an erroneous outcome, he has not adduced sufficient evidence that "gender bias was a motivating factor" in causing it. *Id.* At most, he simply believes Defendants should have found his arguments more persuasive than they did. As "[f]ederal courts are not a forum for general appellate review of university disciplinary proceedings," this is not enough to establish a triable claim under Title IX. *Regents of the Univ. of Minn.*, 999 F.3d at 582 (quoting *Univ. of Ark.- Fayetteville*, 974 F.3d at 864). In other words, Doe has not "set forth sufficient evidence to allow a reasonable jury to find that [the University] disciplined him on the basis of sex." *Rossley*, 979 F.3d at 1192. The Court therefore GRANTS summary judgment on Doe's Title IX claim.

### C.  The Court Grants Summary Judgment on Doe's Equal Protection Claims.

Doe alleges that Kronstein, Gibson, and Uden-Holman violated the Equal Protection Clause by discriminating against him because he is male. "The Equal Protection Clause requires the government treat all similarly situated people alike." *Creason v. City of Washington*, 435 F.3d 820, 823 (8th Cir. 2006). Plaintiffs bringing Equal Protection claims must establish they were "treated differently from others similarly situated." *Regents of the Univ. of Minn.*, 999 F.3d at 580 (quoting *Creason*, 435 F.3d at 823)). Alleged comparators must be "similarly situated in all relevant respects." *Id.* (quoting *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 797 (8th Cir. 2011)). The Reporting Party in this case is not, for instance, a proper comparator: "it goes almost without saying that a sexual assault complainant and those she accuses of sexual assault are 'not similarly situated as complainants.'" *Id.* at 581 (quoting *Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 74 (1st Cir. 2019)).

Doe did not respond at all to Defendants' summary judgment motion on his equal protection claim (*see generally* ECF 44-3), which is reason enough to grant summary judgment against him. *See, e.g.*, *F.D.I.C. v. Bell*, 106 F.3d 258, 265 n.9 (8th Cir. 1997) ("It was not merely imprudent for [the defendants] to fail to advance evidence to support their allegations; it was necessarily fatal to their defense."). Even if he had responded, Doe has not identified any female comparators, much less shown that Kronstein, Gibson, and Uden-Holman treated those

comparators differently than him. This is fatal to his Equal Protection claims. *See Regents of the Univ. of Minn.*, 999 F.3d at 580–81 (granting summary judgment on equal protection claims for failure to allege a differently treated comparator). It also means Kronstein, Gibson, and Uden-Holman would be entitled to qualified immunity, as one obviously cannot be deprived of a "clearly established" constitutional right if he was not deprived of a constitutional right at all. *See Rowles*, 983 F.3d at 357. The Court GRANTS summary judgement for all relevant Defendants on Count II.

### D.  The Court Grants Summary Judgment on Doe's Due Process Claims.

Doe's final claims are for substantive and procedural due process violations against Kronstein, Gibson, and Uden-Holman in their official and individual capacities. (ECF 12, ¶¶ 54–61.) "An official-capacity claim is a claim against the institution, so Doe's allegation here is that the University denied him due process of law in the disciplinary process." *Univ. of Ark. - Fayetteville*, 974 F.3d at 866 (cleaned up). "[A] university can fail to provide due process by (1) failing to substantially follow its established procedures—that is, failing to comply with procedural due process, or (2) taking disciplinary action against a student that is arbitrary, unreasonable, or in bad faith—that is, failing to comply with substantive due process." *Dordt Univ.*, 616 F. Supp. 3d at 907. "Under either a procedural or substantive theory, 'the fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.'" *Id.* (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (cleaned up)).

"[P]rocedural due process must be afforded . . . by way of adequate notice, definite charge, and a hearing with opportunity to present one's own side of the case." *Univ. of Ark. - Fayetteville*, 974 F.3d at 866 (quoting *Esteban v. Cent. Mo. State Coll.*, 415 F.2d 1077, 1089 (8th Cir. 1969)). "A university's procedures include, for instance, the terms of its student handbook and honor code." *Dordt Univ.*, 616 F. Supp. 3d at 907. "Evidence showing that hearing procedures were 'imperfect' is not sufficient." *Id.* Regarding substantive due process, "[a]n action is unreasonable when it is 'not guided by reason,' and is 'irrational or capricious.'" *Id.* at 909 (quoting *Unreasonable*, BLACK'S LAW DICTIONARY (11th ed. 2019)). "[T]o show bad faith, a plaintiff must show a defendant's intention to evade truth—a '[d]ishonesty of belief, purpose, or motive.'" *Id.* (quoting *Bad faith*, BLACK'S LAW DICTIONARY (11th ed. 2019)).

Doe's supports his due process claims with the same evidence and arguments as his Title IX claims, including that Defendants "ignored" exculpatory evidence, made improper credibility

determinations, and did not give sufficient weight to Dr. Dewdney's opinions. (ECF 44-3, pp. 12–13.) The record shows, however, that Doe had adequate notice of the hearing, was represented by counsel, presented witnesses (including an expert who was permitted to testify over Kronstein's and Gibson's objections), filed briefs, submitted questions for Parks to ask witnesses, and interjected during the hearing. The record further shows that Defendants provided detailed factual findings and analyses at each stage of the investigation, adjudication, and appeal stages, including, for example, explaining their credibility determinations and why Dr. Dewdney's testimony was given little weight. The record contains no meaningful evidence that Defendants "fail[ed] to substantially follow" University procedures or took disciplinary action that was "arbitrary, unreasonable, or in bad faith." *Dordt Univ.*, 616 F. Supp. 3d at 907; *see also University of Ark.s - Fayetteville*, 974 F.3d at 867–68 (affirming dismissal of due process claims despite university crediting female student's testimony and witnesses over male student's and not asking "pertinent follow up questions" of certain witnesses during a disciplinary hearing).

"Students accused of sexual misconduct are not 'entitled to a hearing of one's own design.'" *Regents of the Univ. of Minn.*, 999 F.3d at 582 (quoting *Austin v. Univ. of Or.*, 925 F.3d 1133, 1139 (9th Cir. 2019)). Because Doe's "allegations . . . fall far short of plausibly alleging [he was] deprived of an opportunity to respond to the misconduct charges 'at a meaningful time and in a meaningful manner,'" his official-capacity due process claims fail. *Id.* (quoting *Mathews*, 424 U.S. at 333). Because his official-capacity claims fail, so do his individual-capacity claims. *See Univ. of Ark. - Fayetteville*, 974 F.3d at 869 ("Because we determine that Doe has not stated a claim under the Due Process Clause against the officials in their official capacities, it follows that the parallel due process claims against the officials in their individual capacities were properly dismissed.").

The Court similarly concludes that Defendants did not take action against Doe that was "arbitrary, unreasonable, or in bad faith," and thus his substantive due process claims also fail. *Dordt Univ.*, 616 F. Supp. 3d at 907. Finally, given Doe's failure to establish a substantive or procedural due process violation, Kronstein, Gibson, and Uden-Holman are entitled to qualified immunity. *See Rowles*, 983 F.3d at 357. The Court therefore GRANTS summary judgment for all relevant Defendants on Count III.

### III.   Conclusion.

Although Doe disagrees with the outcome of the University of Iowa's investigation into his alleged sexual misconduct, he has not identified any defects that rise to a federal statutory or constitutional violation. The Court therefore GRANTS Defendants' Motion for Summary Judgment (ECF 30) in its entirety. The Clerk of Court is directed to enter judgment for Defendants.

IT IS SO ORDERED.

Dated: August 22, 2023

_____

STEPHEN H. LOCHER
U.S. DISTRICT JUDGE